UNITED STATES of America, Appellee,

v.

**James GRANT, Appellant.**

**No. 859, Docket 75–1430.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1976.

Decided Oct. 18, 1976.

Certiorari Denied Feb. 22, 1977. See 97 S.Ct. 1130.

---

Phyllis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, New York City, on the brief), for appellant.

Paul Vizcarrondo, Jr., Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., and John C. Sabetta, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The chief question presented on this appeal is whether under the circumstances of this case appellant "use[d] a firearm to commit [a] felony" within the meaning of the Gun Control Act of 1968. We hold that he did. Appellant also raises a subordinate question as to whether there was sufficient evidence of his constructive possession of cocaine to submit that issue to the jury. We hold that there was.

James Grant was convicted after a three day jury trial in the Southern District of New York, Charles M. Metzner, *District Judge,* on one count of possession of cocaine (Count 1) and three counts of possession of cocaine with intent to distribute it (Counts 2, 3 and 4) in violation of 21 U.S.C. § 841(a)(1) (1970); and on five counts of using a firearm to commit a felony (Counts 6, 7, 8, 9 and 10) in violation of 18 U.S.C. § 924(c)(1) (1970).[1]

For the reasons below, we affirm.

## I. FACTS

Grant's conviction arose out of a raid on the premises of the Piggy Back Social Club in the Bronx on January 22, 1975. During searches of the several rooms occupied by the club, agents of the federal Drug Enforcement Administration (DEA) and the Bureau of Alcohol, Tobacco and Firearms (ATF), accompanied by officers of the New York City Police Department, seized large amounts of cocaine, material for processing narcotics and an arsenal of firearms and ammunition. The searches were carried out pursuant to federal search warrants.

Piggy Back was an after-hours social club. It was located on the second floor of 1–9 East 167th Street. The front door of the building could be unlocked from the second floor by means of a buzzer mechanism.

Two hallways converged at the top of the stairs that led to the second floor. One of the hallways led to the back of the club where there were located a kitchen, restrooms and another back room. The other hallway led to the left of the staircase; off of this hallway were five rooms with doors marked "Room I" through "Room V", respectively. Room V was the club's bar room.

The doors to Rooms I, II and V were of solid wood, reinforced with a sheet of metal on each side and secured by heavy double-bar locks. The door to Room I had a double-bolted deadlock. The key cylinders in all the doors were secured by hardened case

---

1. On October 15, 1975 he was sentenced to concurrent terms of imprisonment of six months on Count 1 and of two and a half years on each of Counts 2, 3, 4 and 6–10. He also was ordered placed on special parole for con-

current terms of three years on each of Counts 2, 3 and 4 following his release from prison.

The jury acquitted him on Count 5 which charged possession of cocaine with intent to distribute it.

metal plates to prevent them from being pulled out. All the door frames were solid steel and were set in concrete walls.

A television camera was located at the top of the second floor landing. It was aimed at the building's front door. Other television cameras were aimed at the doors to Rooms I and V. Room I contained a four-screen television monitor. Another television screen was located opposite the bar in Room V.

At 10:30 A.M. on January 22, special agents of the DEA and the ATF, accompanied by officers of the New York City Police Department, entered the building to execute a search warrant for Room I which had been issued the previous day.[2] The agents encountered three men loitering on the second floor landing and asked for the manager. A few moments later Grant walked down the hallway from the back of the club. One of the DEA agents asked Grant whether he was in charge of the whole area. Grant replied, "Yes, I'm the manager of the club."

The agent identified himself and told Grant that they were looking for a fugitive. The agent asked if they could talk with Grant inside one of the offices. Grant took out his keys, unlocked the door to Room I and took the agents inside.

Once inside Room I, the agents told Grant that they were there to execute a search warrant. As Grant sat down, an agent noticed in Grant's shirt pocket a cellophane bag containing white powder. The agent pulled the bag out and asked what it was. Grant replied that it was cocaine for his own use. The agent placed him under arrest and advised him of his constitutional rights. The white powder later was found to be 5.38 grams of 61.2 per cent cocaine hydrochloride. It was the subject of the offense charged in Count 1 of the indictment.

Room I was divided into two smaller rooms by a wall that had an opening without a door. As the agents began searching Room I, Grant told them that the room was his office; that he lived there; and that he slept on a couch in the inner room of Room I.

During their search of Room I the agents found 3.03 grams of cocaine in a desk drawer (the subject of Count 2); a loaded Dan Wesson .357 magnum revolver in a steel credenza (Count 6); a loaded Winchester 30–30 caliber automatic rifle under cushions on the couch where Grant said he slept (Count 7); a loaded Plainfield .30 caliber semi-automatic pistol behind the same couch (Count 9); and a loaded .45 caliber Remington semi-automatic pistol, with an extra clip of ammunition, in a desk drawer (Count 8). They also found in the steel credenza 120 rounds of ammunition for the various guns they had seized, and a large amount of material for cutting cocaine.

Also while searching Room I one of the agents noticed a small hole in one of the walls. He looked through the hole into Room II. There he saw on a table a strainer and cellophane bags. One of the agents left and obtained a search warrant for Room II.

Upon executing the second search warrant, the agents used Grant's keys to enter Room II. That room had some desks and tables and appeared not to be generally used by the club members. In a desk drawer, however, the agents found two packages which contained a total of 226.26 grams of cocaine (Count 3). They also found in a desk drawer a Sturm Ruger .357 magnum revolver (Count 10). Among other items seized from this room were a strainer and 155 grams of starch. Both of these items were used to cut cocaine.

Later that evening a man named Brown entered the premises and told the agents that he used to live there. He led the

---

**2.** The affidavit for the search warrant was based on an informant's tip. A DEA agent testified at the pretrial suppression hearing that the informant told him that a machine gun was concealed in Room I; that drugs were being brought into the club; and that Grant was distributing the drugs to members of the club. The district court denied Grant's motion to suppress. That ruling is not challenged on appeal.

agents to the back room next to the kitchen and forced the door open with his shoulder. This room also was divided into two smaller rooms. In the outer room the agents saw in plain view and seized 178.45 grams of cocaine (Count 4), 330 grams of marijuana and material used to cut narcotics.

That same evening one of the agents used Grant's keys to unlock Room IV. There they found and seized 25.57 grams of cocaine (Count 5) and 114 grams of marijuana.

At about 9:00 P.M. that same evening the agents arrested a man named Taylor on the premises. At the time of his arrest Taylor had just reached the second floor landing which led to the club rooms. He was carrying a Baretta pistol. He also had in his possession a number of rounds of ammunition which did not fit the Baretta pistol but did fit the two magnum pistols found earlier in Rooms I and II.

At the trial which began September 22, 1975 and concluded three days later, the government relied on the testimony of four government agents who testified about the events and the items seized during the January 22 raid. The defense called one witness, a DEA agent, who testified that at Grant's request he returned to Grant three car keys that had been taken at the time of his arrest.

## II. FIREARMS COUNTS

We turn first to the principal claim raised by Grant on appeal—that the evidence failed to establish that he "use[d] a firearm to commit [a] felony" within the meaning of 18 U.S.C. § 924(c)(1).[3] He argues that the evidence at most showed that he merely "possessed" the guns.

Grant's counsel on appeal has presented a thorough analysis of the legislative history of Section 924(c)(1), emphasizing the differences between that section and Section 924(c)(2).[4] She points out that Section 924(c)(1) proscribes "us[ing] a firearm to commit any felony," whereas Section 924(c)(2) proscribes carr[ying] a firearm unlawfully during the commission of any felony" (emphasis added). She relies on various statements in the legislative history of these sections which indicate that one who merely carries a firearm during the commission of a felony does not come within Section 924(c)(1).[5]

The government concedes, and we agree, that Section 924(c)(1) was not intended to apply to either the mere carrying of a firearm or the carrying of a firearm with intent to use it during commission of a felony.

■ We hold that the evidence established that Grant used the guns as part of a tight security operation to protect large quantities of cocaine and hence to commit the felony of possessing cocaine with intent to distribute it.

The Piggy Back Social Club was a veritable fortress. It had television cameras to monitor the front door and the corridors; special doors reinforced with sheets of metal; steel door frames set in concrete walls; and heavy duty locks and bars to prevent break-ins. Anyone who entered the club was put on notice of the extraordinary se-

---

3. 18 U.S.C. § 924(c)(1) (1970) in relevant part provides:
   "(c) Whoever—
   (1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States . . .
   *   *   *
   shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years."

4. Section 924(c)(2) is identical with Section 924(c)(1), supra note 3, except that subsection (c)(2) in relevant part provides:
   "(c) Whoever—

*   *   *
   (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall [be punished]."
The critical element of the Section 924(c)(2) offense is the unlawful carrying of a firearm during the commission of a felony as distinguished from the use of a firearm to commit a felony which is proscribed by Section 924(c)(1).

5. See Judge Bryan's discussion of the legislative history of Section 924(c)(2) in United States v. Ramirez, 482 F.2d 807, 813–14 (2 Cir.), cert. denied, 414 U.S. 1070 (1973).

curity arrangements. The guns which were found in the rooms amounted to a small arsenal. They were loaded and they were strategically located. They were part and parcel of the tight security operation. We recently took judicial notice, based on "[e]xperience on the trial and appellate benches" that "substantial dealers in narcotics keep firearms on their premises as tools of the trade. . . ." *United States v. Wiener,* 534 F.2d 15, 18 (2 Cir. 1976).

### III. NARCOTICS COUNTS

Grant also claims that the evidence failed to establish that he had constructive possession of the cocaine found in Room II and the back room by the kitchen.[6] We find this claim to be without merit.

Grant admitted that he was the manager of the club and was in charge of the entire area. He carried keys which opened each of the rooms except the back room by the kitchen. Quantities of cocaine were found in plain view in Room I and on Grant himself. The rooms in which the cocaine, firearms and cutting materials were found apparently were not open to the club members, with the exception of Room IV which was involved in the offense charged in Count 5 on which Grant was acquitted.

We hold that the evidence was sufficient for the jury to find that Grant had the necessary dominion and control to establish his constructive possession of the cocaine. *United States v. Casalinuovo,* 350 F.2d 207, 209 (2 Cir. 1965).

Affirmed.

---

6. Apparently Grant does not challenge on appeal his conviction on Count 2 which involved the 3.03 grams of cocaine found in the desk drawer in Room I.

And while his brief (p. 25) dealing with the narcotics counts challenges his convictions based on cocaine "found in Room II and Room IV", we assume that he intended to refer to the 226.26 grams and 178.45 grams of cocaine found respectively in Room II and the back room by the kitchen (Counts 3 and 4), since he was acquitted on the count based on the 25.57 grams of cocaine found in Room IV (Count 5).

In any event, we hold that there was sufficient evidence to support the convictions on each of the counts with respect to which he has appealed.