Gino Josh Singer, New York City, for defendant.

**UNITED STATES of America,**

**v.**

**Luis Romero LOPEZ, a/k/a "Luis Diaz", "Luis Diaz", "Luis Ortiz", Defendant.**

**No. 90 Cr. 353 (CSH).**

United States District Court, S.D. New York.

Feb. 19, 1991.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Luis Romero Lopez (hereinafter "Romero") was charged in a five-count indictment. The first three counts alleged substantive violations of the federal narcotics laws, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 845a(a). The fourth count charged Romero with the use of firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The fifth count charged Romero with possessing a firearm that was not registered to him in the National Firearms Register and Transfer Record, in violation of 26 U.S.C. § 5861.

Trial commenced before a jury. At the conclusion of the government's case, Romero moved under Rule 29, Fed.R.Crim.P., for a judgment of acquittal on Counts Four and Five. The Court denied the motion as to Count Five but granted it as to Count Four.[1] This Opinion sets forth the Court's reasons for granting Romero judgment of acquittal on Count Four.

### The Indictment

Count One of the indictment charged that on or about May 1, 1990, in the Southern District of New York, Romero distributed and possessed with intent to distribute approximately 27.6 grams of heroin.

Count Two charged:

On or about May 16, 1990, in the Southern District of New York, LUIS ROMERO LOPEZ, the defendant, unlawfully, intentionally and knowingly did possess with the intent to distribute a Schedule I controlled substance, to wit, approximately 24 grams of a mixture and substance containing a detectable amount of heroin, within 1,000 feet of the real property comprising St. Raymond's Elementary School, 2830 East Tremont Avenue, Bronx, New York.

Count Three charged:

On or about May 16, 1990, in the Southern District of New York, LUIS ROMERO LOPEZ, the defendant, unlawfully, intentionally and knowingly did possess with intent to distribute a Schedule I controlled substance, to wit, approximately 46 grams of a mixture and substance containing a detectable amount of heroin, within 1,000 feet of the real property comprising St. Raymond's Elementary School, 2380 East Tremont Avenue, Bronx, New York.

Count Four of the indictment charged:

On or about May 16, 1990, in the Southern District of New York, LUIS ROMERO LOPEZ, the defendant, during and in relation to a drug trafficking crime, namely, possession with intent to distribute a mixture and substance containing a detectable amount of heroin, for which he may be prosecuted in a court of United States, unlawfully, willfully and knowingly, did use and carry firearms, to wit, a 12 gauge E.R.A. sawed-off shotgun, a 38 calibre Smith and Wesson revolver, and a 9 millimeter Heckler and Koch semi-automatic hand gun.

Count Five charged that on or about May 16, 1990, in the Southern District of New York, Romero possessed the shotgun referred to in Count Four, which was not registered with the National Firearms Register and Transfer Record.

Although the indictment does not say so explicitly, the evidence at trial made it apparent, and counsel for the government acknowledged during oral argument on the Rule 29 motion, that Count Two of the indictment was "the charge on which the § 924(c) charge rests." Tr. 393.

### The Government's Proof

The government's drug case was made by a confidential informant who put Romero in contact with David Dongilli, an agent of the federal Drug Enforcement Agency acting in an undercover capacity. The May 1, 1990 violation charged in Count One of the indictment came about when Dongilli and the confidential informant met with Romero and another individual at the corner of Third Avenue and 86th Street in Manhattan. Romero instructed Dongilli to follow him in his car to an address at 2331 Powell Avenue in the Bronx, where Romero maintained an apartment. Romero entered the building at 2331 Powell Avenue, came out again ten minutes later and approached Dongilli, who was waiting in his car, and handed Dongilli a quantity of heroin wrapped in a plastic bag, for which Dongilli paid the previously agreed price.

Dongilli had subsequent telephone conversations with Romero looking towards a further purchase. Some of those telephone conversations were recorded. Between May 1 and May 16, 1990 Dongilli placed telephone calls to Romero at three telephone numbers: a mobile telephone Romero maintained, the Powell Avenue apart-

---

**1.** Romero thereupon pleaded guilty to the other counts.

ment, and an apartment at 1725 Purdy Street, the Bronx, where Romero also maintained an apartment.

In the telephone calls subsequent to May 1, 1990 Dongilli was attempting to negotiate a purchase of two ounces of heroin from Romero. On May 16, 1990 at about 4:25 p.m. Dongilli telephoned Romero at the Powell Avenue number. Dongilli testified on direct examination:

Q. What did the defendant say at that time, or what did you both say at that time?

A. He told me he was in possession of 2 ounces of heroin and that I could meet him at East Tremont in front of the Sizzler Restaurant.

Q. Is that on the intersection of East Tremont and another road?

A. Yes, East Tremont and Purdy. Tr. 294.

At about 7:00 p.m. on May 16, Dongilli drove to the parking lot of the Sizzler Restaurant at the intersection of East Tremont Avenue and Purdy Street. Dongilli parked his car and stood on the sidewalk on East Tremont Avenue. At about 7:20 p.m. Romero appeared with another male in a blue Oldsmobile. Romero left his car, approached Dongilli, and said "that he had 2 ounces of heroin" but was willing to sell Dongilli only one. Tr. 295. Dongilli agreed to purchase the lesser amount and he and Romero agreed on the price. Dongilli asked who the second male was. Romero identified him as his brother "George." Dongilli then testified:

He [Romero] then told me the heroin was in a nearby location and he would be back shortly. At that time him, Luis Lopez [as Dongilli referred to him] and his brother walked I believe southbound on Purdy Street. At that time I got into my car.

\*　　\*　　\*　　\*　　\*　　\*

Q. Did there come a time when the defendant returned to the parking lot?

A. Yes. I saw them walking north on Purdy Street in the direction of myself. Once they finally walked over to my car, the brother entered the blue Oldsmobile and Luis Lopez entered my car. At that time he pulled out a paper towel. Inside the paper towel was a Zip–Loc bag which had the ounce of heroin in it. Tr. 296–97.

At that point Dongilli executed an arrest signal and back-up agents placed Romero under arrest.

The government reverted to the telephone call at 4:25 p.m. on May 16 on redirect examination:

Q. As both defense counsel and you discussed, during that call you and Lopez arranged the meeting that evening, right?

A. Yes, we did.

Q. And Lopez told you to meet him somewhere?

A. East Tremont and Purdy Avenue.

Q. He also told you something else during that call, didn't you?

A. Yes. He also told he [sic] was in possession of the 2 ounces of heroin. That is when we set up the meet, after that.

Q. He told you he was in possession of it at the time, when you were talking to him?

A. Yes, sir. He said he was in possession of the 2 ounces. Tr. 336.

Shortly after the arrest, the investigating agents obtained warrants to search the apartments Romero maintained at the Purdy Street and Powell Avenue buildings. These buildings are about 14 city blocks distant from each other.

The quantity of heroin referred to in Count Two of the indictment is that quantity which Romero handed over to Dongilli immediately before his arrest on May 16. The search of the Purdy Street apartment on May 16 led to the discovery of the additional quantity of heroin referred to in Count Three. The agents also found in the Purdy Street apartment cutting agents for the dilution of heroin, a triple beam scale and wooden block with white powder substance upon them, a quantity of glasseine bags commonly used for the marketing of smaller amounts of heroin, hand stamps used to place "trade names" on the glasseine bags, and inked stamp pads.

The search of the Powell Avenue apartment, also conducted on May 16, disclosed no drugs. The agents did find a triple beam scale upon which no powder residue appeared, and a box of unstamped glasseine envelopes. They also found the three firearms described in Count Four of the indictment.

The government's theory in charging Romero with violation of 18 U.S.C. § 924(c)(1) is that he used the firearms found in the Powell Avenue apartment "during and in relation to" his possession of the 24 grams of heroin referred to in Count Two which he handed over to agent Dongilli at the intersection of East Tremont Avenue and Purdy Street immediately prior to Romero's arrest on May 16.

## Discussion

Count Four charges Romero with violating 18 U.S.C. § 924(c)(1). The statute provides in pertinent part:

Whoever, during and in relation to any ... drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, ...

■ Rule 29 requires a judgment of acquittal on a particular charge at the close of the government's case "if the evidence is insufficient to sustain a conviction of such offense ..." The Court, in evaluating a Rule 29 motion, is required to view the evidence in the light most favorable to the government, including whatever reasonable inferences may be drawn from that evidence. A reasonable mind must be able to conclude guilt on each and every element of the charged offense; but the trial court should not substitute its own determination of the credibility of witnesses, the weight of the evidence, or the reasonable inferences to be drawn for that of the jury. *See, e.g., United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984), and cases cited.

■ In the case at bar, the government's opposition to Romero's Rule 29 motion proceeded from the theory that the jury could

reasonably infer Romero possessed at the Powell Avenue apartment the heroin which he delivered to Dongilli in the vicinity of the Purdy Street apartment. In oral argument, the government contended that Romero had admitted as much in his 4:25 p.m. telephone conversation (not recorded) with Dongilli. Thus the counsel argued:

... As we heard testimony from Dave Dongilli, the defendant admitted having drugs to the agent on the day with which he is charged on the § 924(c) count in the Powell Avenue Apartment. Tr. 373.

And again:

He [Romero] admits himself that he had 2 ounces at the Powell Avenue address, that is certainly evidence of possession with intent to distribute at the Powell Avenue address in conjunction with the guns. Tr. 376.

And again:

In this case the defendant said in his own words that he had those drugs in that location [Powell Avenue] in the same quantity at a price which he three hours later sells to the undercover agent. Tr. 390.

In point of fact counsel, inadvertently I am sure, overstated the evidence. On direct examination Dongilli quoted Romero as having said that "he was in possession of 2 ounces of heroin and that I could meet him at East Tremont in front of the Sizzler Restaurant." Tr. 294. On redirect Dongilli testified that Romero told him "that he was in possession of the 2 ounces of heroin. That is when we set up the meet, after that." Tr. 336. Romero did not tell Dongilli where he possessed the heroin; and trial judges traditionally instruct jurors that "possession" can be actual, immediate, and physical, or constructive, in the sense of exercising dominion and control over an object located somewhere else.

It is a close question whether the jury could reasonably infer that Romero possessed the heroin in the May 16 transaction at the Powell Avenue apartment. To be sure, the May 1 transaction, which took place in front of the Powell Avenue building, quite likely involved the delivery by

Romero to Dongilli of heroin that Romero previously possessed in the Powell Avenue apartment. Certainly the jury could so find, and if that was all there was to the evidence, the jury could clearly reasonably infer that the heroin delivered on May 16 also came from the Powell Avenue apartment. But that is not all there was to the evidence. On May 16 the Purdy Street apartment contained quantities of heroin, and the Powell Avenue apartment contained none. Furthermore, when Romero met Dongilli in the early evening of May 16 in the vicinity of the Purdy Street apartment, Romero told Dongilli that "the heroin was in a nearby location and he would be back shortly." Tr. 296. Romero and his companion then walked from the restaurant parking lot south on Purdy Street, toward the building in question, and then returned walking north towards the parking lot, away from that building, bringing the heroin.

Those circumstances argue in favor of an inference that the heroin Romero handed Dongilli on May 16 was possessed by Romero at the Purdy Street apartment, and not at the Powell Avenue apartment. If that was so, the government's theory of § 924(c)(1) liability in Count Four loses its essential predicate. But there was other evidence available to the government to support its inference, namely, that Romero brought two ounces of heroin from the Powell Avenue address and went to Purdy Street to repackage it in the smaller one ounce quantity. I could not, consistent with *Mariani*, base Romero's directed verdict of acquittal on Count Four upon a holding that the jury could not reasonably infer Romero's possession of the heroin in question at the Powell Avenue apartment. Rather, the analysis which follows assumes that prior to the May 16 transaction Romero possessed that specific quantity of heroin at the Powell Avenue apartment.

The gun charge was subject to Rule 29 dismissal because, under Second Circuit authority, the jury could not reasonably have found use by Romero of a firearm during and in relation to the drug trafficking crimes established by the proof.

Section 924(c)(1) separately punishes an offender who, "during and in relation to any drug trafficking crime ..., uses or carries a firearm ..." Carrying a firearm is not implicated in this case. The decisive issue is Romero's "use" of the firearms found in the Powell Avenue apartment "during and in relation to" the May 16 drug trafficking crime alleged in Count Two.

The present wording of section 924(c)(1) derives from a 1984 amendment to the statute. The original wording dealt with use and carriage in separate subsections. As originally enacted, the statute provided for an enhanced penalty in respect of:

(c) Whoever—

(1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or

(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, ...

While the Supreme Court has characterized the legislative history of § 924(c) as "sparse," *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), there has been judicial notice of the statement of Congressman Poff, who proposed the statute, that it was intended "to persuade the man who is tempted to commit a federal felony to leave his gun at home." 114 Cong.Rec. 22231 (1968), *quoted in United States v. Gironda,* 758 F.2d 1201, 1214 (7th Cir.1985).

The 1984 amendment established as the predicate offense for "use" of a firearm "any crime of violence" instead of "any felony," and substituted the phrase "during and in relation to" for the word "during." In 1986, the statute was again amended to add "drug trafficking crime" as a predicate offense.

The Second Circuit considered the legislative history of the 1984 amendment in *United States v. Feliz–Cordero,* 859 F.2d 250, 254 (2d Cir.1988):

The legislative history of the 1984 amendment indicates that the "in relation to" language was intended to make explicit that a person could not be prose-

cuted under section 924(c) for possessing a firearm during the commission of an entirely unrelated crime. S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314 n. 10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10. Thus, section 924(c) requires more than mere possession of a firearm. Rather, there must be some relation or connection between the firearm and the underlying crime. The necessary relation or connection between possession of a firearm and the underlying crime is established "if from the circumstances or otherwise it could be found that the defendant *intended to use the gun* if a contingency arose or to make his escape." *Id.* (emphasis added). *Id.* at 254.

In the light of that legislative history, the Second Circuit in *Feliz–Cordero* summarized the proof necessary to sustain conviction of one who "uses" a firearm:

> Based on the foregoing analysis, in order for possession of a firearm to come within the "uses" provision of section 924(c), one of the following is required: i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction. *Ibid.*

Applying those standards, the Second Circuit reversed a conviction for firearm use. The facts were these. Government agents had agreed to purchase "crack" from one Muniz and another individual. An agent, acting in undercover capacity, drove Muniz and the other target to an address at 144 Wyckoff Avenue, Brooklyn. After the transaction went down, the agents arrested Muniz, who quickly agreed to cooperate. Muniz told the agents that on the day of his arrest, he had entered Apartment 3 at 144 Wyckoff Avenue, the residence of defendant Cordero. Cordero was not there, so Muniz went upstairs to Apartment 5, defendant Encarnacion's residence. Muniz obtained 150 vials of "crack" from Encarnacion in Apartment 5. This occurred on February 13, 1987. After his arrest and agreement to cooperate, Muniz was outfitted with a recording transmitter. Muniz returned to Apartment 3 where both defendants were waiting. The prior "crack" transportation was discussed and the conversation recorded. A warrant was obtained to search Apartments 3 and 5. The warrants were executed on February 18. The results of the searches are summarized by the court of appeals as follows:

> In Apartment 3 the agents found, among other things, a small quantity of cocaine, drug records, approximately $11,000 in cash, a beeper, and in a bedroom dresser drawer, a .38 caliber Smith & Wesson revolver loaded with 5 rounds of ammunition, and additional rounds of ammunition.
>
> In Apartment 5 the agents found, among other things, cocaine and cocaine base, plastic vials, a scale, a hot plate, strainers, straight edge razor blades, and a quantity of chemicals used to cut cocaine. The agents seized all of the items found.

Both Cordero and Encarnacion were convicted of one count of conspiracy to possess cocaine base with intent to distribute; two counts of possession with intent to distribute; one count of distribution; and one count of carrying or using a firearm in relation to a drug trafficking crime, in violation of § 924(c)(1).

The Second Circuit held that viewing these facts in the light of the evidentiary requirements it had articulated, the firearm conviction could not stand:

> In the present case, the presence of a firearm in a dresser drawer does not meet either of the requirements set out above. On the evidence presented, there is no basis to conclude that the gun would have been quickly accessible if needed. Rather, under the circumstances of this case, the intent to use the firearm must be presumed from the fact that a loaded gun was found in the same room as drug paraphernalia during the

course of a search pursuant to a warrant. This is not sufficient evidence to sustain a conviction, even in light of our recognition of the frequent connection between firearms and narcotics trafficking. *Id.* at 252.

In *Feliz–Cordero* the government unsuccessfully relied upon *United States v. Grant*, 545 F.2d 1309 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977). The *Feliz–Cordero* court distinguished *Grant:*

> Application of the test set out above to the facts of *Grant* shows that it is clearly distinguishable from the evidence in the present case. In *Grant*, it was apparent from the circumstances surrounding the presence of the firearms that the drug dealers intended to use the guns. The evidence established that there were many weapons strategically located, within easy access, in a "veritable fortress" in which security of the drug operation was the prime concern. *Id.* at 1310–13. *Id.* at 254.

It is also pertinent to observe that the firearms leading to the § 924(c)(1) conviction in *Grant* were found in an apartment containing sizable amounts of cocaine. *See* 545 F.2d at 1312 ("... the evidence established that Grant used the guns as part of a tight security operation to protect large quantities of cocaine and hence to commit the felony of possessing cocaine with intent to distribute it.")

Seven months after *Feliz–Cordero*, a different Second Circuit panel decided *United States v. Meggett*, 875 F.2d 24 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989). In the case at bar, the government argued that *Meggett* changed the rule of *Feliz–Cordero:*

> THE COURT: ... I am asking you whether in the government's view the *Feliz–Cordero* rule is unchanged by any of the subsequent cases, and if so, how has it been changed.
>
> MR. WAINSTEIN: Well, I would think that the *Meggett* case has certainly changed it. It would be by explicitly upholding Judge Leisure's jury instructions in that case.

> THE COURT: It changed it.
>
> MR. WAINSTEIN: Yes.

Tr. 383.

If the Second Circuit in *Meggett* overruled *Feliz–Cordero*, it did so *sub silentio*, and in the face of a professed determination to adhere to that earlier decision. The *Meggett* court explained the holding in *Feliz–Cordero* in these terms:

> Implicitly recognizing the teaching of the prior case law to the effect that "use" requires possession of a gun under circumstances where the weapon is so placed as to be integral part of the offense, we emphasized the absence of proof that the defendants in *Feliz–Cordero* had placed the weapon to have it available for easy use during the transaction. 875 F.2d at 29.

In *Meggett* the Second Circuit affirmed a gun charge conviction on the following facts. The case involved the distribution of heroin to an undercover agent on four separate occasions. On each occasion the source of the heroin was one Bradley, and the heroin "originated from or passed through Bradley's apartment 3G, 990 Anderson Avenue, in the Bronx." 875 F.2d at 25. The middleman between Bradley and the purchasing undercover agent, a City detective named Baxter, was Bradley's co-conspirator Meggett. On the first of the four transactions, Meggett obtained heroin from Bradley at Apartment 3G and sold it to Baxter, the delivery taking place in Manhattan. On the second distribution, Meggett went to apartment 3G, obtained a sample of better heroin from Bradley, and gave that sample to Baxter, also in Manhattan. The third and fourth distributions both occurred on the same day. Meggett telephoned Bradley at the apartment, was advised that samples of heroin were available, went to the apartment, picked up a sample, and delivered the sample to Baxter. Meggett returned to apartment 3G and, pursuant to Baxter's instructions, called Baxter on a beeper phone. Baxter stated he wished to buy an additional quantity of heroin, Bradley gave Meggett the three ounces of heroin at apartment 3G, and both Meggett and Bradley drove to a restaurant

in Manhattan, where Meggett made the delivery to Baxter and both Meggett and Bradley were arrested.

During the evening of the arrests, the agents obtained a search warrant for Apartment 3G. The occupant of the apartment, Bradley's wife, refused to open the door. The agents obtained entrance by use of a battering ram. They found Bradley's wife in the bathroom disposing of the contents of 11 clear plastic bags which were scattered through the bathroom. The toilet bowl was filling with water. Off-white powdery residue was found scattered throughout the bathroom. Other items seized at the apartment included a small foil packet of cocaine, a triple beam balance scale, an empty bottle of cutting agent, and over 100 empty vials with colored stoppers. The agents also seized at the apartment five firearms, four of which were operable, and a supply of ammunition.

These firearms gave rise to the gun charge against Bradley, who admitted he owned the guns found in Apartment 3G, but stated so that he did so only as a gun collector. Judge Leisure charged the jury in part:

> You should note ... that in order for the government to sustain its burden of proof that the defendant used a firearm, it is not necessary for the government to establish that the weapon was fired. It is sufficient if the proof established that the firearm furthered the commission of the drug trafficking crime or was an integral part of the underlying crime being committed. 875 F.2d at 27.

The jury convicted Bradley on the gun charge. The Second Circuit affirmed. It approved Judge Leisure's instruction, and then stated:

> The evidence justified conviction. The jury could reasonably conclude that the five loaded firearms in Bradley's apartment were on hand to protect that apartment as a storage and processing point for large quantities of narcotics and that therefore the presence of weapons furthered or facilitated the narcotics operation and was an integral part thereof.

The Second Circuit referred to a number of earlier cases involving comparable facts, including *Grant, supra.*

Bradley contended on appeal that the use of the firearm must occur "in connection with the ultimate object of the conspiracy as distinct from a preliminary stage," so that his conviction could not stand because there was no proof of the use of a firearm at the scenes of distribution in Manhattan. Rejecting that argument, the Second Circuit said:

> There is no merit to this argument. The conspiracy count in the indictment charged that it was "a part and object" of the conspiracy that Bradley and others would both distribute heroin and possess heroin with intent to distribute. Thus Bradley's possession of heroin at his apartment was a "part and object" of the crime of conspiracy, just as much as distribution to an ultimate purchaser. Use of firearms in connection with such possession was a proper basis for conviction on the firearms count. *Id.* at 29

Three months after *Meggett,* the Second Circuit decided *United States v. Alvarado,* 882 F.2d 645 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). In *Alvarado* a gun charge conviction was affirmed on appeal. The *Alvarado* court quoted *Meggett's* interpretation of *Feliz–Cordero, see* 882 F.2d at 653, and affirmed the gun conviction on the following facts.

One Colon, a confidential informant, made several visits to defendants' apartment at 2329 First Avenue to purchase cocaine. On November 10, 1987, Colon purchased a small quantity of cocaine at the apartment. On November 13, he returned and purchased a larger amount of cocaine. On November 17, Colon returned for a third time and purchased another quantity of cocaine. On November 18, he returned to the apartment a fourth time, and was told that there was nothing to sell, but that he should return later. Upon Colon's return, some minutes later, the occupant of the apartment, a youth named Alex, told Colon that he would have to buy from one "Choco," who was selling for

Alex in the street. Colon purchased a bag of cocaine from Choco. On November 19 Colon returned to the apartment for the fifth time, was again directed to buy from Choco in the street, and did so.

On the evening of November 20, agents executed a warrant at the apartment. The search revealed 108 grams of cocaine, glasseine bags, triple beam balance scales, heat sealers, strainers with a residue of white powder, a loaded pistol in a drawer, a bullet-proof vest, and a locked safe containing two loaded handguns and cash. The agents also discovered documents indicating that the apartment was the residence of defendant Alvarado and his wife.

Alvarado was convicted on a gun charge and appealed. The Second Circuit affirmed the conviction. It stated at 882 F.2d at 654:

> As in *Meggett* and *Grant*, the evidence here supports the jury finding that the several loaded weapons in Alvarado's apartment were strategically located to protect the substantial quantities of cocaine that were packaged and sold in the apartment, as established both by Colon's several drug purchases there and the drugs and drug paraphernalia seized upon execution of the search warrant, and to provide added security during drug sales. *Id.* at 654.

Given the close proximity of quantities of cocaine and a bullet-proof vest to the safe in which two of the firearms were found, the court of appeals reasoned that the jury could believe "that Alvarado was quite prepared to use the guns." The court continued:

> A jury could reasonably infer that the guns were "on hand to protect th[e] apartment as a storage and processing point for large quantities of narcotics," and that they "furthered or facilitated the narcotics operation and w[ere] an integral part thereof." *Meggett*, 875 F.2d at 29. Thus, unlike *Feliz–Cordero*, there was ample proof "that the defendants . . . had placed the weapon[s] to have [them] available for ready use during [drug] transaction[s]," *Meggett*, 875 F.2d at 29 (construing *Feliz–Cordero* ), and the evidence was accordingly sufficient

to support a conviction on count five. *Ibid.*

In *United States v. Torres*, 901 F.2d 205 (2d Cir.1990), the conviction of one defendant on a § 924(c) charge was affirmed and that of another reversed. The case involved the "Torres Organization," which after its inception in Manhattan moved to the South Bronx and distributed heroin. The Torres Organization purchased unprocessed heroin in bulk and processed it in various apartment houses. After the heroin was packaged in glasseine envelopes, it was delivered to and sold on the streets by a network of runners and street managers. The transactions were documented in ledgers which were kept in a number of apartments leased by individuals connected with the organization. Eventually, as the result of law enforcement investigation and surveillances a number of search warrants were executed. One of the searched apartments was leased by defendant Natalie Vazquez, where agents found a loaded handgun under a queen size mattress. The apartment also contained bundles of heroin, bulletproof vests, over $200,000 in cash, jewelry appraised in excess of $100,000, a $10,000 gold ingot, drug records, rubber stamps and stamp pads, a heat sealer, and address books containing telephone numbers of members of the Torres Organization. "The apartment was also tied to the Torres Organization through a recorded telephone conversation which indicated that a package of heroin was to be dropped off there." 901 F.2d at 217.

The Second Circuit affirmed Natalie Vazquez' conviction under § 924(c)(1). Vazquez relied on *Feliz–Cordero*, but the court of appeals concluded that the facts of the case more closely resembled *Meggett* and *Alvarado*. The proof in *Torres* concerning the Vazquez apartment entitled the jury to conclude "that the apartment was used for narcotics trafficking on a continuing basis, bolstering the likelihood that the weapon seized was used 'during and in relation to any . . . drug trafficking crime' within the meaning of section 924(c)(1)." *Id.* at 218. The court of appeals rejected Vazquez' argument that the gun was un-

derneath a mattress. The Second Circuit cited and paraphrased the Eighth Circuit's decision in *United States v. Matra*, 841 F.2d 837, 842–43 (8th Cir.1988), where the court found "that a machine gun hidden under a waterbed frame in a locked bedroom was 'an integral part of [the] criminal undertaking' because it served to protect the cocaine and cash stored in the apartment." 901 F.2d at 218.

In *Torres* the Second Circuit reversed the § 924(c)(1) conviction of defendant Reginald Velez. Velez was one of the several managers employed by the Organization. He reported to defendant Nelson Flores, the second in command after the two Torres brothers. A search of one of the apartments led to the discovery of a slip of paper itemizing receipts and expenses given by Velez to Flores, one of the many submitted over a four-month period covered by seized ledgers, and a corresponding ledger entry by Flores. The slip filled out by Velez showed a $150 expenditure for a shotgun with the added notations: "Bought a shotgun for our protection," and "we had to buy a gun because their [are] a lot of things happ[en]ing so we want to feel safe." Flores entered a deduction in his ledger as follows: "shotgun–150." The shotgun was not seized or presented in evidence. Velez was convicted under § 924(c)(1).

The Second Circuit reversed, on the ground that the slip and ledger entry failed to establish that the shotgun was used "during and in relation to any ... drug trafficking crime." The *Torres* court's analysis of prior Second Circuit authority is instructive:

> We stated in *Meggett* that statutory use "requires possession of a gun under circumstances where the weapon is so placed as to be an integral part of the offense," 875 F.2d at 29 (construing *Feliz–Cordero*), noting that the reversal of the firearm conviction in *Feliz–Cordero* resulted from "the absence of proof that the defendants ... had placed the weapon to have it available for ready use during the transaction," *id.* even though the weapon in *Feliz–Cordero* was found together with drug paraphernalia in a

defendant's apartment. Here, by contrast, assuming that Velez did purchase the shotgun as reflected by the slip and ledger entry, and assuming further that he intended to use it as stated—"for our protection," it nonetheless remained to be proved that it was actually so used. There was no evidence as to where the shotgun was *placed,* and no evidence that the shotgun was ever in fact utilized to protect the narcotics operation or its proceeds. Under these circumstances, both the statutory language and our precedents require the reversal of Velez' conviction under section 924(c)(1). *Id.* at 218–19.

Contrary to the government's contention at bar, the Second Circuit has not reversed or departed from its holding in *Feliz–Cordero*. That case continues to be cited and applied. *Feliz–Cordero, Meggett, Alvarado* and *Torres* contain passages which, in isolation, may be made to support sweeping propositions. But the cases are intensely fact-oriented; and the current state of Second Circuit authority on the statutory "use" of firearms during drug transactions cannot be divined without careful analysis of the underlying facts.

So viewed, the government's case against Romero was not as weak as that against the successful appellant in *Torres;* but its proof was not as strong as that against the successful appellant in *Feliz–Cordero*. In *Feliz–Cordero,* the gun conviction was reversed even though the purchaser had come to the apartment in which the gun was found in connection with the drug transaction alleged; discussions concerning that transaction took place in that apartment; and, in addition to the gun, the apartment contained cocaine, drug records, a large amount of cash and a beeper. The Second Circuit reversed the conviction on the ground that the finding of a loaded gun in the same room as drug paraphernalia was insufficient to sustain a § 924(c)(1) conviction. In the case at bar, the undercover purchaser never came to the Powell Avenue apartment in connection with the May 16 transaction, and no drugs or cash were found in that apartment. There was

a scale and unmarked glasseine bags, but nothing to indicate that the apartment was being used at that time as a place for the storage of significant amounts of drugs or for the processing and sale of drugs. In those respects the Powell Avenue apartment differs not only from the apartment in *Feliz–Cordero*, but also from Romero's Purdy Street apartment, where a quantity of heroin was found, together with paraphernalia clearly indicating that the apartment was being used as an active processing mill. Had the guns been found in that apartment, the case would have gone to the jury. But *Feliz–Cordero*, on its facts, controlled the case at bar *a fortiori* and so Romero's Rule 29 motion succeeded.

The government's concept of use of a firearm in relation to a drug trafficking crime would, if sound, permit the conviction of a defendant who packaged heroin in Hong Kong, decided to sell it in the Bronx, interrupted his trip for one night in Denver where he maintained an apartment containing a gun, journeyed on to the Bronx, and sold the heroin on the street. The government contended for that result in the Rule 29 colloquy, and it is of course the logical conclusion of its argument. But I cannot reconcile that argument with the Second Circuit's requirement that the weapon be so placed as to be an integral part of the offense, particularly when that criterion is viewed in the factual context of the cases where convictions have been reversed (*Feliz–Cordero, Torres*) as well as affirmed (*Meggett, Alvarado, Torres*).

It is not possible to establish a bright line of demarcation in these cases. However, the Second Circuit has held repeatedly that to sustain a § 924(c)(1) conviction, the presence of a weapon must be an "integral part" of a drug trafficking crime. The adjective is significant. There must be proof that the presence of the weapon furthered or facilitated the narcotics operation established by the proof. In all the cases where convictions were affirmed, the weapons were found in apartments where quantities of drugs were stored and processed so as to make possible the transactions revealed by the proof. It is in such circumstances that the Second Circuit permits a

jury to draw the inferences that the guns were on hand to protect the apartment as a storage and processing point for large quantities of narcotics, and that the defendant was prepared to use the weapons for that purpose. In the case at bar, the government proved no circumstances from which the jury could reach those conclusions. On the contrary, within the context of Romero's May 16 sale of heroin to Dongilli as charged in Count Two, Romero (in Congressman Poff's phrase) "left his guns at home."