UNITED STATES of America, Appellee,

v.

**Trent L. WILLIAMS, Appellant.**

No. 91–3615.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 15, 1992.

Decided Dec. 31, 1992.

---

Allen I. Harris, St. Louis, MO, argued, for appellant.

Thomas J. Mehan, St. Louis, MO, argued, for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.

McMILLIAN, Circuit Judge.

Trent L. Williams appeals from a final judgment entered in the District Court for the Eastern District of Missouri, upon a jury verdict, finding him guilty of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii), and use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The district court sentenced appellant to a total of 138 months imprisonment (78 months for the drug offense, 60 months for the firearms offense), 4 years of supervised release, and a special assessment of $100.00. For reversal, appellant argues the district

court erred in finding that (1) the substances seized from his automobile were crack cocaine (cocaine base), (2) there is a rational basis for the sentencing guidelines' distinction between powder cocaine and crack (cocaine base), (3) the racial disparity between the sentences for offenses involving powder cocaine and crack cocaine (cocaine base) does not violate equal protection, and (4) the firearm found in his automobile was "used" during and in relation to a drug trafficking crime. For the reasons discussed below, we affirm the judgment of the district court.

## BACKGROUND FACTS

On January 9, 1991, around 3:00 a.m., officer Bryant K. Morris, of the Pine Lawn, Missouri, Police Department, observed a light-colored automobile proceeding north with its headlights out. As Morris began to make a U-turn, he saw the automobile turn into a service station. After completing his U-turn and having activated his police lights, Morris followed the automobile and pulled into the service station lot. When he was within 10–15 feet of the automobile and while he was getting out of the patrol car, Morris saw the driver make a motion with his right arm and also heard a thump which sounded like an object falling to the floor-board of the automobile. After Morris ordered the driver out of the automobile, he requested some identification. The driver had no driver's license, but he did produce some identification in the name of "Trent Lamar Wilkins."

When Morris looked inside the automobile, he could see the front floorboard area and saw a .32 caliber semi-automatic handgun. Morris arrested the driver, who was later identified as appellant, and conducted an inventory search of the automobile. On the front floorboard, near where he had seen the gun, Morris found two cellophane bags containing several hard, white, rock-like substances which Morris recognized as crack cocaine. In one of the cellophane bags were 9 smaller bags and inside each of the smaller bags was one "rock." Because of Morris's police training and experience, he continued to look for more drugs and, when he removed the cap on the gaso-

line tank, he found inside the gasoline tank a large bag containing more hard, white, rock-like substances. Additionally, Morris seized from appellant a pager, four pieces of jewelry, including a ring engraved with appellant's nickname, and $545 in small denominations. Although appellant stated that he was unemployed, Morris during the booking process also seized certain documents from appellant, including the bill of sale for the automobile which appellant had purchased for $3450 in cash just 5 days before his arrest.

Appellant was indicted and charged with possession with intent to distribute crack cocaine and use of a firearm during and in relation to a drug trafficking crime. Appellant's pre-trial motion to suppress evidence was denied. The case was tried to a jury. Victor Granat, the supervisor of the St. Louis County Police Crime Laboratory, testified as an expert witness. Granat testified that he had analyzed samples of the hard rock-like substances seized from appellant's automobile and had determined that it was crack cocaine. Based upon his training and experience, Granat testified that his first impression upon viewing the substances was that it was rock cocaine or crack cocaine. Granat described the preliminary test he used to analyze the substances: he took a small sample of the material, applied various reagents, and looked for a color reaction indicating the possible materials that may be present. Based upon the result of the preliminary test, Granat testified that he then took another sample of the material and performed a gas chromatographic spectrometer examination. Granat testified that the results of this test showed that the substance contained cocaine, and he identified the substance as rock cocaine, that is, cocaine in the form of "crack" or "rock cocaine." On cross-examination Granat testified that he examined 15–20 individual pieces or "rocks."

Detective Bryan Gilmore, a detective in the City of St. Louis Police Department, testified that he had been a police officer for more than 13 years, including more than 4½ years in the narcotics unit, and that he knew the difference between

"crack" and "cocaine." Gilmore did not conduct any chemical tests of the substances. Gilmore testified that "cocaine" refers to cocaine hydrochloride and is cocaine in its powdered form. Gilmore explained that to make crack, one "cooks" cocaine hydrochloride, which, when it dries, becomes a hard, rock-like substance which is referred to as "crack" or cocaine base. Gilmore testified that he had made hundreds of purchases of crack cocaine on the streets of the City of St. Louis and identified the government's exhibits, the substances seized from appellant's automobile, as crack cocaine. Gilmore also testified about the dosage units of crack cocaine, its value and how it is sold and packaged. Gilmore also testified that, based upon his training and experience, a pager or beeper is commonly used in the drug trafficking trade and that the .32 caliber semi-automatic handgun is a tool of the drug trafficking trade used by drug dealers to prevent rivals from moving into their territory and to protect themselves from robbery. On cross-examination by defense counsel about his ability to distinguish between real and fake crack cocaine, Gilmore testified that, based on his experience and observation, he would definitely say that the government's exhibits were crack cocaine.

The jury found appellant guilty on both counts. At the sentencing hearing appellant challenged the constitutionality of sentencing guideline § 2D1.1(a)(3) (the 100 to 1 ratio for crack to powder cocaine) on due process and equal protection grounds and introduced a survey compiled by the local public defender's office. According to the survey, of 165 persons charged with cocaine offenses during a 3–year period, 91 were African–American, 53 were white and 6 were Hispanic (there was insufficient information about the ethnic identity of 15), and of the 17 persons charged with crack cocaine or cocaine base offenses, 16 were African–American and only 1 was white. The district court rejected appellant's constitutional challenges and sentenced appellant to a total of 138 months imprisonment, 4 years supervised release, and a special assessment of $100.00. This appeal followed.

## SUFFICIENCY OF IDENTIFICATION OF SUBSTANCE

■ Appellant first argues there was insufficient evidence that the substances seized from his automobile were crack cocaine or cocaine base. He argues that case law has not consistently defined or identified crack cocaine or cocaine base. *See, e.g., United States v. Wheeler*, 972 F.2d 927, 930 & nn. 5–6 (8th Cir.1992) (various chemical terms and physical characteristics used to describe crack cocaine or cocaine base). We disagree.

An appellate court, in reviewing the sufficiency of the evidence, is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences which support the jury verdict, and may only reverse if a reasonable jury could not have found the defendant guilty beyond a reasonable doubt. *E.g., United States v. Meeks*, 857 F.2d 1201, 1204 (8th Cir.1988).

■ In the present case, the government's expert witness, Granat, testified that his initial impression was that the substances were probably "rock cocaine" or crack cocaine and that his initial impression was confirmed by the chemical tests he performed. In addition, Granat testified that cocaine can be present in many forms, including a flaky, white powder that can be inhaled and a harder, rock-like form that is first heated and then smoked. Granat specifically identified the government's Exhibit No. 2 as "cocaine base," which, he explained, is "the proper name for 'rock' or 'crack' cocaine." Moreover, the identity of a controlled substance can also be proved by circumstantial evidence and opinion testimony. *Id.* Here, an experienced narcotics detective testified that in his opinion the government's exhibits were crack cocaine and expressly referred to the government's Exhibit No. 2 as "an awful big piece of crack cocaine ... a pretty big chunk." We hold the evidence was sufficient to support the jury's finding that the substances seized from appellant's automobile were crack cocaine or cocaine base.

## DISPARITY IN SENTENCING—DUE PROCESS

■ Guidelines § 2D1.1(a)(3) uses a 100 to 1 ratio for powder cocaine to crack cocaine or cocaine base, that is, 100 grams of powder cocaine is the equivalent of 1 gram of crack cocaine or cocaine base. Appellant argues the sentencing guidelines' distinction between powder cocaine and crack cocaine or cocaine base is not supported by a rational basis and thus violates due process, citing *State v. Russell*, 477 N.W.2d 886, 888–91 (Minn.1991) (banc) (holding distinction between penalties for crimes involving crack cocaine and powder cocaine lacked rational basis and thus violated equal protection clause of state constitution).

This court has upheld the constitutional validity of the 100 to 1 ratio against due process challenges in other cases. *See, e.g., United States v. Reed*, 897 F.2d 351, 353 (8th Cir.1990); *United States v. Buckner*, 894 F.2d 975, 978–80 (8th Cir.1990). The 100 to 1 ratio is directly derived from 21 U.S.C. § 841(b), which mandates the same minimum sentence for crimes involving 5 grams or more of crack cocaine, *id.* § 841(b)(1)(B)(iii), as for crimes involving 500 grams or more of powder cocaine, *id.* § 841(b)(1)(B)(ii)(II). We have held that there is a rational basis for the more severe penalties for crimes involving crack cocaine or cocaine base than for those involving powder cocaine. "Members of Congress considered cocaine base [or crack cocaine] to be more dangerous to society than [powder] cocaine because of crack [cocaine]s potency, its highly addictive nature, its affordability, and its increasing prevalence." *United States v. Buckner*, 894 F.2d at 978 (footnote omitted).

## DISPARITY IN SENTENCING—EQUAL PROTECTION

■ Appellant next argues the sentencing guidelines' 100 to 1 ratio discriminates on the basis of race between persons convicted of crimes involving crack cocaine or cocaine base and those convicted of crimes involving powder cocaine and violates the equal protection clause. Appellant cites in support the survey conducted by the local public defender's office and *State v. Russell*, 477 N.W.2d at 887 n. 1 (statistics provided to state trial court showed that of all persons charged with possession of crack cocaine or cocaine base in 1988, 96.6% were black, and of all persons charged with possession of powder cocaine, 79.6% were white).

This court has upheld the validity of the 100 to 1 ratio against equal protection challenges in other cases. In *United States v. House*, 939 F.2d 659, 664 (8th Cir.1991), we held that the 100 to 1 ratio does not impermissibly differentiate on the basis of race between individuals convicted of offenses involving crack cocaine or cocaine base and those involving other forms of cocaine by providing higher penalties for those trafficking in crack cocaine or cocaine base. *Accord United States v. Willis*, 967 F.2d 1220, 1225–26 (8th Cir.1992) (declining to reconsider *United States v. House* in light of *State v. Russell*); *United States v. Simmons*, 964 F.2d 763, 767 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992); *United States v. Johnson*, 944 F.2d 396, 404 n. 7 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). *But see United States v. Willis*, 967 F.2d at 1226 (Heaney, J., concurring) (expressing reservations about sufficiency of record supporting view that Congress had sound basis to make harsh distinction between powder cocaine and crack cocaine or cocaine base, particularly in light of evidence racial disparity in drug enforcement).

## SUFFICIENCY OF EVIDENCE OF "USE" OF FIREARM

■ Appellant next argues there was insufficient evidence that the firearm was "used" during and in relation to a drug trafficking crime. Appellant argues the government failed to show a sufficient nexus or connection between the handgun found in his automobile and the underlying drug trafficking crime. He argues that the evidence established at most only mere possession or mere availability, neither of which is sufficient to sustain a conviction under 18 U.S.C. § 924(c)(1).

■ We review the evidence in the light most favorable to the government as the prevailing party, giving it the benefit of all reasonable inferences. Title 18 U.S.C. § 924(c)(1) provides that "[w]hoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years." We have held that 18 U.S.C. § 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a felony involving drug trafficking. *See, e.g., United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985). The government need not show that the defendant was "in actual physical possession of the firearm, or that [the defendant] brandished or discharged it.... The jury need only find a 'sufficient nexus' between the [firearm] and the drug trafficking crime." *United States v. Watson,* 953 F.2d 406, 409 (8th Cir.1992) (citations omitted), *citing United States v. Lyman,* 892 F.2d 751, 752 (8th Cir.1989), *cert. denied,* 498 U.S. 810, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990).

We hold there was sufficient evidence from which the jury could have reasonably found that appellant "used" the handgun during and in relation to a drug trafficking crime. In the present case the handgun, which was loaded, was found in the automobile in a place that was readily accessible to appellant, who was the only occupant of the automobile at the time of the investigatory stop and search, and in close physical proximity to a large quantity of crack cocaine or cocaine base, some of which was packaged in small quantities consistent with distribution, and $545 in cash. An additional quantity of crack cocaine or cocaine base was also found in another part of the automobile. There was also evidence that drug dealers often use firearms to protect themselves, their product and their money from other dealers and robbers. *See United States v. Watson,* 953 F.2d at 409 (revolver found under driver's seat of defendant's car which she drove to train station to pick up drug courier; AK–47 found underneath bed in defendant's house, which was used as drug storage and distribution point; presence and availability of firearm in car and in house held sufficient to prove "use" during and in relation to drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)); *United States v. Moore,* 580 F.2d 360, 362 (9th Cir.) (defendant arrested for attempted bank robbery; evidence of pistol concealed in trousers was central to planned robbery held sufficient to prove "use" during and in relation to crime of violence in violation of 18 U.S.C. § 924(c)(1)), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978); *United States v. Grant,* 545 F.2d 1309, 1312 (2d Cir.1976) (guns used to protect large quantities of cocaine violated 18 U.S.C. § 924(c)(1)), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977).

Accordingly, we affirm the judgment of the district court.

BRIGHT, Senior Circuit Judge, concurring separately.

Today the court upholds, in the face of due process and equal protection challenges, the Sentencing Commission's decision to penalize possession of a given weight of cocaine base (crack) at a level equivalent to possession of a weight of cocaine 100 times greater. Given the precedents of this court, I find myself obliged to concur in that holding. *See, e.g., United States v. Buckner,* 894 F.2d 975, 978–80 (8th Cir.1990) (upholding 100:1 ratio against due process challenge); *United States v. House,* 939 F.2d 659, 664 (8th Cir.1991) (upholding 100:1 ratio against equal protection challenge). I write separately to note the racial injustice flowing from this policy.

One of the goals in establishing the Sentencing Guidelines was to reduce racial disparities in sentencing. *United States v. Lattimore,* 974 F.2d 971, 974 (8th Cir.1992) (quoting Sentencing Commission Chairperson Wilkins). Despite this aim, the unexplained difference in the average sentence for African–Americans as compared to Caucasians has actually increased from a difference of 28% in 1984 to 49% in 1990. Federal Judicial Center, *The General Effect of Mandatory Minimum Prison Terms* 20–21 (1991). Guidelines

§ 2D1.1(a)(3) aggravates these differences because African–Americans constitute a much higher proportion of cocaine base offenders than cocaine offenders. *See State v. Russell,* 477 N.W.2d 886, 887 n. 1 (Minn.1991) (banc) (97% of Minnesotans charged with possession of cocaine base in 1991 were African–American, whereas 80% of those charged with possession of powder cocaine were Caucasian); *ante* at 1212 (defense study indicates 94% of those charged in Eastern District of Missouri with possession of cocaine base were African–American, whereas only 55% of those charged with possession of powder cocaine were African–American). While the Sentencing Guidelines' distinction between cocaine base offenders and cocaine offenders may not violate the equal protection clause because the racial discrepancies are not shown to be the result of intentional discrimination, it undermines the original aim of the Guidelines and should be reconsidered.[1]

Further, I reiterate my opinion that these racial discrepancies in sentencing, unforeseen by the Sentencing Commission in formulating the Guidelines, may constitute an acceptable basis for some downward departure in sentencing under 18 U.S.C. § 3553(b). *See Lattimore,* 974 F.2d at 977 (Bright, J., dissenting).

---

**1.** My concern for racial disparity in cocaine base and cocaine-related sentencing extends to the statutory mandatory minimum sentences imposed by Congress equating, for example, offenses involving five grams of cocaine base with those involving 500 grams of cocaine (a 1:100 ratio). *See* 21 U.S.C. § 841(b)(1)(B)(ii) and (iii) (1988). I believe Congress, in the first instance, should address the racial inequity in the formulation of cocaine base and cocaine sentences.