STATE of Minnesota, Petitioner,
Appellant,

v.

Gerard RUSSELL, Dmitry Deshone Armstead, Michael Odell Johnson, Steve Antonio Morrison, and James Alderson, Respondents.

Nos. C3–91–22, C7–91–203.

Supreme Court of Minnesota.

Dec. 13, 1991.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Lee W. Barry, Senior Asst. County Atty., Minneapolis, for appellant.

David P. Murrin, Frances B. Moore, Richard A. Trachy, Nancy Yost Laskaris, Renee J. Bergeron, Warren R. Sagstuen, Asst. Public Defenders, and William McGee, Legal Rights Center, Minneapolis, for respondents.

Atty. Gen. and Minnesota County Attys. Ass'n, Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, for amicus curiae.

WAHL, Justice.

We are asked, in this pre-trial appeal, to consider the following certified question:

Does Minnesota Statute 152.023, Subd. 2(1) (1989), as it is applied, violate the equal protection clauses of the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution, Article 1, Section 2?

Under Minn.Stat. § 152.023, subd. 2, a person is guilty of a third degree offense if he or she possesses three or more grams of cocaine base [hereinafter "crack cocaine"]. Under the same statute, a person must possess ten or more grams of cocaine powder to be guilty of the same offense. A person who possesses less than 10 grams of cocaine powder is guilty of a fifth degree offense. Minn.Stat. § 152.025 (1990).

Pursuant to these statutes, possession of three grams of crack cocaine carries a penalty of up to 20 years in prison while possession of an equal amount of cocaine powder carries a penalty of up to five years in prison. Under the sentencing guidelines, the presumptive sentence for possession of three grams of crack cocaine is an executed 48 months imprisonment. The presumptive sentence for possession of an equal amount of cocaine powder is a stayed 12 months of imprisonment and probation.

Defendants, five African–American men who were charged with violating Minn.Stat. § 152.023, subd. 2, jointly moved the trial court to dismiss the charges on the ground that the statute has a discriminatory impact on black persons and violates the equal protection guarantees of the federal and state constitutions.

The trial court found that crack cocaine is used predominantly by blacks and that cocaine powder is used predominantly by whites.[1] As a result, a far greater percentage of blacks than whites are sentenced for possession of three or more grams of crack cocaine under Minn.Stat. § 152.023 with more severe consequences than their white counterparts who possess three or more grams of cocaine powder. The trial court concluded that the law has a discriminatory impact on black persons.

The trial court then determined that no rational basis supported the distinction between crack-cocaine and cocaine powder and that the law therefore violated constitutional guarantees of equal protection. The trial court granted the defendants' joint motion to dismiss and certified the question of the statute's constitutionality to the court of appeals pursuant to Minn. R.Crim.P. 28.03. We granted a joint petition for accelerated review filed by both the state and the defendants pursuant to Minn.R.Civ.App.P. 118 and Minn.R.Crim.P. 29.02, subd. 1. We affirm.

Review of an equal protection challenge under the federal rational basis test requires (1) a legitimate purpose for the challenged legislation, and (2) that it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose. *Western & S. Life Ins. Co. v. State Bd. of Equaliza-*

---

1. Among the many statistics provided to the trial court were those showing that of all persons charged with possession of cocaine base in 1988, 96.6% were black. Of all persons charged with possession of powder cocaine, 79.6% were white.

*tion,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981) [2].

The state argues that the challenged statute passes muster under that test. It contends that the legislature has a permissible and legitimate interest in regulating the possession and sale of crack cocaine and cocaine powder and that it was reasonable for lawmakers to believe that the three grams of crack—ten grams of powder classification would regulate the possession of those drugs by the "street level" dealers at whom the statute was primarily aimed.

■■■ Even if we were to agree with the state's argument as to the analysis under the federal test, we strike the statute as unconstitutional under the rationale basis test as articulated under Minnesota law. Since the early eighties, this court has, in equal protection cases, articulated a rational basis test that differs from the federal standard, requiring:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Wegan v. Village of Lexington,* 309 N.W.2d 273, 280 (Minn.1981) (quoting *Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138, 142 (1980)).

2. To invoke strict scrutiny of a statute that has a racially discriminatory impact, under current federal equal protection analysis, requires a showing that the legislature enacted the particular statute " 'because of' not merely 'in spite of' " an anticipated racially discriminatory effect. *McCleskey v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987). This standard not only places a virtually insurmountable burden on the challenger, who has the least access to the information necessary to establish a possible invidious purpose, but it also defies the fundamental tenets of equal protection. In the words of Professor Tribe,

> Government officials cannot be held accountable to the constitutional norm of equality unless they "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." This overlooks the fact that minorities can also be injured when the government is "only" indifferent to their suffering or "merely" blind to how prior official discrimination contributed to it and how current acts will perpetuate it.
>
> \* \* \* \* \* \*
>
> If government is barred from enacting laws with an eye to invidious discrimination against a particular group, it should not be free to visit the same wrong whenever it happens to be looking the other way. If a state may not club minorities with its fist, surely it may not indifferently inflict the same wound with the back of its hand.

L. Tribe, *American Constitutional Law,* § 16–21, at 1518–19 (2nd ed. 1988).

There comes a time when we cannot and must not close our eyes when presented with evidence that certain laws, regardless of the purpose for which they were enacted, discriminate unfairly on the basis of race, e.g., that for the murder of a white person in Georgia, a black person is more than twice as likely as a white person to be sentenced to death (*See McCleskey v. Kemp,* 481 U.S. at 286, 107 S.Ct. at 1763); that, in Minnesota, the predominantly black possessors of three grams of crack cocaine face a long term of imprisonment with presumptive execution of sentence while the predominantly white possessors of three grams of powder cocaine face a lesser term of imprisonment with presumptive probation and stay of sentence.

We have our state constitution and in interpreting our state equal protection clause, "we are not bound by federal court interpretation of the federal equal protection clause." *AFSCME Councils 6, 14, 65 & 96 v. Sundquist,* 338 N.W.2d 560, 580 (Minn.1983) (Yetka, J., dissenting). While we are ordinarily loathe to intrude or even inquire into the legislative process on matters of criminal punishment, the correlation between race and the use of cocaine base or powder and the gross disparity in resulting punishment cries out for closer scrutiny of the challenged laws. Under Article 1, Section 2 of the Minnesota Constitution, the statistics showing the effect of the statute in operation combined with relevant factors that appear in the statute's history could be held to create an inference of invidious discrimination which would trigger the need for satisfaction of a compelling state interest not shown on the record before us. This issue need not be decided today, however, because we find the statute unconstitutional under the Minnesota rational basis test.

This court has not been consistent in explaining whether the rational basis standard under Minnesota law, although articulated differently, is identical to the federal standard or represents a less deferential standard under the Minnesota Constitution.[3] What has been consistent, however, is that in the cases where we have applied what may be characterized as the Minnesota rational basis analysis, we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires. Instead, we have required a reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals. *See* McKnight, *Minnesota Rational Relation Test: The Lochner Monster in the 10,000 Lakes*, 10 Wm. Mitchell L.Rev. 709, 726 (1984) (analyzing the cases of *Wegan v. Village of Lexington*, 309 N.W.2d 273 (Minn.1981); *Nelson v. Peterson*, 313 N.W.2d 580 (Minn.1981); and *Thompson v. Estate of Petroff*, 319 N.W.2d 400 (Minn. 1982)).

■ Nothing prevents this court from applying a more stringent standard of review as a matter of state law under our state constitutional equivalent to the equal protection clause. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 723 n. 6, 66 L.Ed.2d 659 (1980). Moreover, there is every reason for us to continue to articulate and apply an independent Minnesota constitutional standard of rational basis review. *See In Re Estate of Turner*, 391 N.W.2d 767, 771–73 (Minn.1986) (Wahl, J., concurring specially). To harness interpretation of our state constitutional guarantees of equal protection to federal standards and shift the meaning of Minnesota's constitution every time federal case law changes would undermine the integrity and independence of our state constitution and degrade the special role of this court, as the highest court of a sover-

eign state, to respond to the needs of Minnesota citizens. *Id.* at 773. It is particularly appropriate that we apply our stricter standard of rational basis review in a case such as this where the challenged classification appears to impose a substantially disproportionate burden on the very class of persons whose history inspired the principles of equal protection.

We therefore hold that under our state constitutional standard of rational basis review the challenged statute cannot stand. First, the statute fails for lack of a genuine and substantial distinction between those inside and outside the class. In order to meet this standard, the state must provide more than anecdotal support for classifying users of crack cocaine differently from users of cocaine powder. The primary justification advanced by the state in support of the crack/cocaine classification is that it serves to facilitate prosecution of "street level" drug dealers.[4] The three grams of crack—ten grams of powder formula was adopted because it was thought those amounts indicated a level at which dealing, not merely using, took place.

The primary testimony before the legislature on the distinction between crack cocaine and cocaine powder in terms of the respective amounts of the drugs that indicate street-level dealing came from Mr. James Kamin of the Hennepin County Attorney's Office. He stated at legislative hearings that his knowledge of the quantities possessed by drug dealers did not come from study but "simply from talking with people like Sergeant Strauss and informants, people who have been convicted or are being prosecuted for drug offenses. My knowledge of these numbers come from the streets." Minnesota Senate Criminal Law Subcommittee, 76th Minn.Leg., March 16, 1989.

This purely anecdotal testimony does not establish a substantial and genuine distinc-

---

3. This court has recognized that our state constitution embodies principles of equal protection synonymous to the equal protection clause of the Fourteenth Amendment to the United States Constitution. *See State v. Forge*, 262 N.W.2d 341, 347 n. 23 (Minn.1977).

4. In fact the state argues to this court that this purpose was the sole basis of the legislation and that any pharmacological difference between the substances is irrelevant to the constitutional analysis.

tion. A statutory distinction that provides the basis for prescribing widely disparate criminal penalties is not sufficiently justified when based on the anecdotal observations of one expert witness. This is especially true in light of evidence presented that undermines the conclusion reached by the legislature. For instance, respondents point to a recent report by the Minnesota Department of Public Safety Office of Drug Policy[5] that states that police and prosecutors contacted by researchers are not persuaded by the "street dealer" distinction because they believe that most cocaine powder users are dealers as well. Minnesota Department of Public Safety Office of Drug Policy, *Minnesota Drug Strategy* 1991, p. 14. Without more factual support, the three grams of crack—ten grams of powder distinction appears to be based upon an arbitrary rather than a genuine and substantial distinction.

The second proffered basis for the disparate treatment of crack versus cocaine powder users is that crack is more addictive and dangerous than cocaine powder. The evidence on this point similarly fails to establish a genuine and substantial distinction between those inside and outside the class. The primary legislative testimony on this point was presented by Michael Strauss, an officer from the Minneapolis Narcotics Division, who testified from his experience and training in the Narcotics Division but who did not profess to be a trained scientist.

Further evidence on the chemical properties and physiological effects of crack and cocaine powder was presented to the trial court through the testimony of Dawn Speier, a chemist for the City of Minneapolis. She testified that there is a difference between crack and cocaine powder in the severity of the attack on the central nervous system and respiratory function, and, based on what she had read or heard, that a smaller amount of crack will produce the same effect as cocaine powder. She also

testified, however, that the mood altering ingredient in both powder and base was the same—cocaine. Further, she testified that the difference in effect between the two was based on the way the drug was ingested (cocaine powder being generally sniffed through the nostrils, crack cocaine being smoked). In fact, Speier confirmed that if cocaine powder is dissolved in water and injected intravenously, the effect on the body is similar to the effect of smoking crack cocaine. Thus, as respondents argue, evidence as to the degree of dangerousness between crack and cocaine powder is based on testimony as to effects resulting from different methods of ingestion, rather than on an inherent difference between the forms of the drug. Disparate treatment of crack and powder cocaine users is not justified on the basis of crack's greater dangerousness when there is evidence that powder cocaine could readily produce the effects purported to justify a harsher penalty for possession of crack.

There is also evidence in the legislative record that there is more violence associated with the use of crack than with the use of cocaine powder. This evidence is not only anecdotal, but pales in light of official observation that if there is more violence associated with crack use, "that difference could be caused more by factors such as gang warfare and certain group behaviors than by the pharmacological effects of crack." Minnesota Department of Public Safety Office of Drug Policy, *Minnesota Drug Strategy* 1991, p. 14. Although under the more deferential rational basis test, we may not second guess the scientific accuracy of legislative determinations of fact absent overwhelming contrary evidence, *Moes v. City of St. Paul,* 402 N.W.2d 520, 525 (1987), the rational basis test under the Minnesota Constitution requires more factual support than is present here to establish a genuine and substantial distinction between the two substances.[6]

---

**5.** Cited by the trial court in her Supplemental Findings of Fact and Conclusions of Law.

**6.** The legislature has recently recognized that there is cause for further study of the distinction between crack and cocaine as it relates to

sentencing. In a recent bill the legislature has directed the sentencing guidelines commission to study sentencing practices under Minn.Stat. § 152.023, subd. 2(1) including review of the proportionality of the penalties for and severity

The crack-cocaine distinction also fails because the classification is not relevant to the statutory purpose. Without more evidence to support the asserted dealership levels of drug possession, the three grams of crack—ten grams of cocaine distinction does not further its statutory purpose of penalizing street level drug dealers. Without more evidence, it is as easily assumed that individuals jailed for possession of three grams of crack are mere personal users who were arbitrarily penalized as dealers. Furthermore, a statute which permits a person possessing less than ten grams of powder cocaine, which can be easily converted into more than three grams of crack,[7] to be punished only for 5th degree possession of cocaine, is not only irrelevant to its purpose of penalizing drug dealers, it is also arbitrary and unreasonable.

Lastly, the crack-cocaine classification, while perhaps aimed at the legitimate purpose of eradicating street level drug dealers, employs an illegitimate means to achieve that purpose. The legislature determined that three grams of crack and ten grams of powder indicate a level at which dealing, not merely using, takes place. Once possession of the indicated amounts is proved, intent to sell is presumed, justifying a harsher penalty than that for mere possession. In effect, the statute punishes a person for possession with intent to sell without requiring the prosecution to prove, as an element of the crime, that an actual sale was intended, thus creating an irrebuttable presumption of fact. Leavenworth, Note, *Illegal Drugs and New Laws*, 16 Wm. Mitchell L.Rev. 499, 526 (1990). This court has recognized that statutes creating conclusive presumptions of law or fact have been almost uniformly declared unconstitutional as denying due process of law. *State v. Kelly*, 218 Minn. 247, 250, 15 N.W.2d 554, 557 (1944). Because the stat-

ute creates an irrebuttable presumption of intent to sell without affording the defendant an affirmative defense of lack of intent to sell, and on the basis of that presumption automatically metes out a harsher punishment, the means chosen to effect its purposes are constitutionally suspect.

We answer the certified question in the affirmative and affirm the decision of the trial court. Minn.Stat. § 152.023, subd. 2(1) (1989), violates the Minnesota Constitution, Article 1, Section 2.

Affirmed.

YETKA, Justice (concurring specially).

I concur in Justice Wahl's opinion for the reasons set forth herein.

We must understand that the United States has been and still remains a largely homogeneous society and that the problems of minority groups, particularly blacks, often are misunderstood. The judicial branch is charged with protecting the individual rights and liberties of all citizens, and in a case like this, where we lack the actual experience necessary to place ourselves in the respondents' position, we must rely on our imagination, understanding and analytical judgment to reach the just result.

In today's United States, the gap between the have's and the have-not's is constantly increasing. There is a growing subclass that echoes the late President Franklin D. Roosevelt's description of society during the heart of the Great Depression, when one-third of Americans were ill-housed, ill-clothed and ill-fed. Today's subclass is largely urban. Several generations of some families have suffered and been without work due to lack of adequate education and job-skills training. Moreover, they have never experienced the satisfaction of holding a decent job or owning a

---

level ranking of crack possession, the characteristics of offenders sentenced for crack use relative to other controlled substance offenders and harm to the community resulting from crack possession relative to other controlled substance crimes. 1991 Minn.Laws ch. 279 sec. 37.

7. The trial court found, based on the testimony of Dawn Speier, that powder cocaine can be converted into crack cocaine by removing the hydrochloride from the powder cocaine with baking soda and water. Speier stated that nine grams of powder cocaine that is 90% pure will convert into a little over eight grams of crack cocaine.

home. While it is lamentable when people in these circumstances turn to drugs, is it any wonder that some would be tempted to do so in order to escape the grim reality of their lives?

To me, the obvious solution to the drug problem is to return to basic human values, namely, strong families, solid religious communities, and economic and educational opportunities for all citizens. In the 1930's, we had federal programs such as the Civilian Conservation Corps. The Corps took youths out of poverty-stricken environments and put them to work in our nation's forests and parks and taught them social skills as well as job skills so that they could function and prosper in society. It is beyond the court's capabilities to provide similar opportunities today. However, it is our duty to see that the laws are enforced so as to provide equality before the bench to all citizens, regardless of their race or economic status.

Since all parties to this lawsuit appear to agree that blacks constitute the largest percentage of crack users while whites are the largest users of powder cocaine (which is less potent, more refined and more expensive) and since imposing a greater penalty for crack use thus discriminates against blacks, the legislature must be presumed to be aware of these facts as well. The dissenting opinion suggests that the legislature has unfettered discretion to define criminal acts and set punishments. The legislature's power is admittedly broad in this area, but it is not so broad as to allow distinctions that have a harsher impact on minority groups, particularly when those distinctions are based on minimal information.

Certainly we should laud the legislature for attempting to discourage the use of crack, but should not the elimination of all cocaine use be an equal concern? When it deliberately passes laws which effectively penalize a suspect class, it appears to me that, regardless of which equal protection standard is applied, that action violates both the state and federal Constitutions. I agree with the majority's conclusion that strict scrutiny could be applied to this statute since there is enough evidence from which to infer discriminatory purpose. (Majority Op. at n. 2)

I also agree with the majority's finding that the statute is invalid under rational basis as applied under our state constitution. Where the discrimination is so obvious in the application of our Minnesota drug laws, I agree that we ought to apply state constitutional principles to find the law invalid. When the federal Constitution does not go far enough to protect basic rights and liberties, state courts may look to their own constitutions to determine whether broader protections are warranted. *E.g., Friedman v. Commissioner of Pub. Safety,* 473 N.W.2d 828, 830–31 (Minn.1991); *State v. Hershberger,* 462 N.W.2d 393, 398 (Minn.1990). As the majority rightly concludes, this is a case where our constitution can and should be used to establish a stricter standard than the federal rational-basis test.

I submit that the mere *use* of cocaine is the important factor here, not the form in which the drug is used. Society has decreed that it is illegal to use cocaine in any form except for medical necessity. While the comparison between the use of alcohol and cocaine is not technically accurate because the former is legal while the latter is illegal, some comparison is valid. Although use of alcohol is legal, *abuse* of the same may be an offense. Driving while intoxicated is equally illegal regardless of whether the offender ingested beer, wine, or distilled spirits. Similarly, regardless of whether crack or powder cocaine is used to induce intoxication, it is the *level* of intoxication that is reached with powder as well as crack that affects one's ability to function. Thus equal penalties should be imposed for the use or possession of cocaine regardless of the form used to administer the drug.

As to defining a drug dealer, I again agree with the majority opinion that punishing possession of a drug, without requiring the prosecution to prove intent to sell as an element of the crime, denies due process of law.

Does society intend to eliminate the use of cocaine? If the answer is yes, then it should stress severe penalties not only for the possession, use and distribution of crack, but also of cocaine in any form. Those penalties should be equally and uniformly applied.

SIMONETT, Justice (concurring specially).

As this court develops an equal protection analysis under the state constitution, I find it important to develop our analysis in a principled manner, understandable to the legislature, the bar, and the courts. Because I share the dissent's concern that the court's opinion may be misconstrued as opening the door to substantive due process, I feel I should write.

### I.

Equal protection is confirmed in our state constitution as an "unenumerated" constitutional right. Minn. Const. art. 1, § 16 ("The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people."). Article 1, § 2 provides: "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." [1] One of the inherent rights secured to a free people by section 2 is the inherent right to "equal and impartial laws which govern the whole community and each member thereof." *Thiede v. Town of Scandia Valley*, 217 Minn. 218, 225, 14 N.W.2d 400, 405 (1944). Put another way, persons similarly situated are to be treated alike unless a sufficient basis exists for distinguishing among them. *Bernthal v. City of St. Paul*, 376 N.W.2d 422, 424 (Minn.1985).

Until the late 1970's, little attention was given to the equal protection right secured by article 1, § 2, and, when it was mentioned, it was only in conclusory fashion and often intertwined with the constitutional prohibition against special legislation (art. 12, §§ 1, 2), and the constitutional provision requiring uniformity in taxation (art. 10, § 1).[2] For example, Dunnell's states that article 1, § 2 forbids "class legislation," citing six cases from 1871 through 1951; none of these opinions, however, expressly rely on art. 1, § 2, nor do they explore the meaning of section 2. *See* 7 Dunnell Minn. Digest *Constitutional Law* § 5.03 (4th ed. 1990).

Interestingly, our early cases tended to examine statutes challenged on equality grounds in terms of whether or not the statute was special legislation. The court viewed class legislation as a type of special legislation. *See State v. Cooley*, 56 Minn. 540, 550, 58 N.W. 150, 153 (1893) ("All class legislation is special legislation, although all special legislation is not class legislation * * *."). Although these early cases analyzed equality principles in terms of protection against "class legislation," the analysis parallels modern equal protection principles. *See Allen v. Pioneer Press Co.*, 40 Minn. 117, 120, 41 N.W. 936, 937 (1889) (Justice Mitchell sets out a classic equal protection analysis without mentioning "equal protection" or citing art. 1, § 2).

In the late 1970's, about the time of *Clover Leaf Creamery Co. v. State*, 289 N.W.2d 79 (Minn.1979), *rev'd*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659, *reh'g denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981), our court apparently began to develop its own equal protection analysis. As one commentator points out,[3] in 1981 this court, in *Wegan v. Village of Lexing-*

---

**1.** It appears that Minn. Const. art. 1, § 2 ("rights and privileges"), as well as art. 1, § 7 (the right to "life, liberty or property"), may have come from New York's Constitution, where the identical language appears. In *Baker v. Kelley*, 11 Minn. 480 (Gil. 358, 374–75) (1866), this court relied on New York case law in construing art. 1, § 2 to prevent the state from depriving a person of property without due process of law.

**2.** For an account of the history and evolution of equal protection under our constitution, see McKnight, *Minnesota Rational Relation Test: The Lochner Monster in the 10,000 Lakes*, 10 Wm. Mitchell L.Rev. 709, 722–32 (1984). For a general review of equal protection guarantees under various state constitutions, see Williams, *Equality Guarantees in State Constitutional Law*, 63 Tex.L.Rev. 1195 (1985).

**3.** McKnight, *supra*, at 725.

*ton,* 309 N.W.2d 273, 280 (Minn.1981), found a dram shop notice statute to violate both federal and state equal protection guarantees; in applying a state equal protection analysis, our court borrowed the three-factor test that had been used in tax cases applying our uniformity clause. To satisfy our equal protection guarantee under this test, a law must have: (1) a legitimate legislative purpose; (2) genuine and substantial distinctions, relevant to the purpose of the statute, between those included and those excluded from the statutory classification; and (3) a reasonable connection between the prescribed remedy and the needs peculiar to the class. *Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138, 142 (Minn.1980); *Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979).[4] But 2 years later, in *AFSCME Councils 6, 14, 65 & 96 v. Sundquist,* 338 N.W.2d 560, 569 (Minn.1983), this court rephrased the test as being whether the statutory classification is "rationally related to the achievement of a legitimate governmental purpose," and in a footnote we stressed that our approach to equal protection was "coextensive with * * * the federal equal protection clause." *Id.* at 570 n. 12.

What, then, is the equal protection test under our state constitution? A majority of this court now returns to the three-factor uniformity clause test. I assume, therefore, this is now our equal protection test. A vital question remains, however: When and how is the test to be applied?

## II.

If there are no restraints on the rational basis test, a court may make its own appraisal of what is rational legislation and substitute its own judgment for that of the legislature, thereby reviving the discredited doctrine of substantive due process. To

avoid a "free-wheeling" court, the United States Supreme Court has imposed a variety of restraints on reviewing courts. *City of Cleburne, Tex. v. Cleburne Living Center, Inc.,* 473 U.S. 432, 476, 105 S.Ct. 3249, 3273, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring). If a statute classifies on the basis of race, alienage, national origin, or gender, the federal courts apply heightened levels of scrutiny; if the statute is neutral on its face, the federal courts do not intrude with a heightened scrutiny analysis unless the challenger establishes a prima facie case of discriminatory impact and discriminatory intent. *McCleskey v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987).

For the purposes of our state equal protection guarantee, I would modify this approach so as to preserve a proper regard for the civil liberties of this state's people while at the same time according the legislative branch the deference which the separation of powers doctrine requires.

I would hold that where a facially neutral criminal statute has, in its general application, a substantial discriminatory racial impact, this court may then apply its three-factor rational basis test, even though there is no showing that the legislature intended this impact.[5] It seems to me the critical importance of racial equality in our multicultural society warrants this closely tailored modification.

I would further hold that when a facially neutral criminal statute is shown to produce an inadvertent discriminatory impact based on race, a different manner of applying our rational basis test is necessary. In this context, we may apply our rational basis test with less deference than we afford generally to legislative enactments.

**4.** I have placed the third factor of the *Guilliams–Miller Brewing* test first, as this seems to me a more logical way of proceeding under the three-factor test. Significantly, this test can be traced back to *Loew v. Hagerle Bros.,* 226 Minn. 485, 489, 33 N.W.2d 598, 601 (1948), where it appears in a "special legislation" case.

**5.** *Compare State v. Hershberger,* 462 N.W.2d 393 (Minn.1990). There, a traffic statute was facial-

ly neutral towards religion and, under federal First Amendment analysis, the U.S. Supreme Court held that the test whether the state had used the least intrusive means to avoid infringement of the challengers' freedom of religion rights was not applicable. Our court, however, applying the liberty of conscience provision of our state constitution, held that we would apply the least intrusive test notwithstanding the statute's facial neutrality. *Id.* at 398–99.

By deference, I do not mean the deference appellate courts give trial court fact-finders, but constitutional deference grounded in the separation of powers doctrine. In light of this doctrine, this court generally will find a rational basis "upon any conceivable state of the facts, although the court does not perceive all the facts justifying the classification * * *." *Loew v. Hagerle Bros.*, 226 Minn. 485, 488–89, 33 N.W.2d 598, 601 (1948) (citations omitted). Less deference, it seems to me, means we are less willing to conceive supporting reasons and instead require more tangible elaboration of the reasons for the distinctions made by the legislative classification.

### III.

The statute involved here creates neither a suspect nor a quasi-suspect class. Nor would anyone argue that the defendants have a fundamental right to be "street level" drug dealers. Whether or not the challengers have shown a prima facie case of racially discriminatory impact, in my view there is absolutely no showing of any discriminatory intent or purpose. In short, we have a facially neutral statute where, under federal analysis, heightened scrutiny is not available.[6]

I would, therefore, apply our state equal protection analysis in this case. I conclude a showing has been made that the statute, in its general application, impacts substantially more on black than white defendants. I would then, using less than normal deference, apply our three-factor rational basis test.

It seems to me there are substantial differences in the form, packaging, and marketing of crack and powder cocaine, as well as in the manner of ingestion. But given the relative amounts of cocaine base and cocaine powder involved for third degree possession, I conclude any difference between the two drugs, in terms of harm and danger to the user and the public, is problematic. *Conceivably* there is an appreciable difference in the harm and evil consequences caused by the two drug amounts, but with lessened deference given the legislative enactment, more than conceivable bases or tentative suppositions are needed to establish the substantial distinction between those within and without the class which the applicable equal protection test requires. Therefore, I conclude the statute fails to meet the state's equal protection guarantee, and I concur in the court's opinion.

COYNE, Justice (dissenting).

I respectfully dissent: First, because the majority has abandoned the recognized rule for reviewing a facially neutral crime control statute in favor of an activist form of judicial review which allows the court to substitute its view of the basis for and efficacy of the statute for that of the legislature; and second, because, based on its assumption that crack cocaine and cocaine powder are identical substances—a matter on which experts disagree—the majority proceeds on the false premise that the legislature may not found a legislative distinction on differences in the form and marketing of the two substances.

I begin my analysis by emphasizing the limitations on this court's role *vis à vis* the legislature in matters relating to crime control and the punishment of crimes. As we have stated in other contexts, the judicial branch of government in Minnesota has no inherent authority to set the terms or conditions of punishment for a criminal act. Instead, the power to define appropriate punishment for criminal conduct rests with the legislature as a corollary to its broader power to define what acts constitute criminal conduct. *State v. Osterloh*, 275 N.W.2d 578 (Minn.1978). Justice Powell stated it this way in *McCleskey v. Kemp*, 481 U.S. 279, 319, 107 S.Ct. 1756, 1781, 95 L.Ed.2d 262 (1987):

> Because we live in a union of states, it seems more appropriate to dispose of an equal protection claim under the federal clause if possible, and only resort to the state protection as an alternative.

---

**6.** Some commentators argue that any equal protection claim should be analyzed first under one's state constitution before resorting, if necessary, to the federal standard. Williams, *supra,* at 1223 & n. 182. I am inclined to disagree.

It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes. It is the legislatures, the elected representatives of the people, that are 'constituted to respond to the will and consequently the moral values of the people.' (citation omitted).

Everyone agrees that under the equal protection clause[1] the legislature is not free to make punishment turn on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). However, in reviewing the constitutionality of legislation under the equal protection clause we should remember the words of Justice Holmes, which are as true today as they were nearly 90 years ago:

> Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.

*Missouri, Kansas & Texas Ry. Co. v. May*, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904) (fourteenth amendment equal protection case). We should not lightly or casually presume discriminatory purpose by the legislature.

Certainly, courts must subject any law that makes a classification based on race— any law that is not neutral on its face—to the "most rigid scrutiny" and must strike down the legislation as violative of equal protection unless the state can justify the law by demonstrating that the weightiest of considerations necessitated its enactment. *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (holding the Florida miscegenation law violated the fourteenth amendment). But a law like the statute at issue, which is facially neutral and serves ends properly within the power of government to pursue, is not invalid under the equal protection clause unless the party attacking it can prove discriminatory intent or purpose.

Proof of discriminatory intent or purpose requires *more*, however, than showing that the legislature relied on anecdotal evidence, that the legislature's action is of doubtful wisdom, or that the legislature was aware that the law might "affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). The evidence must affirmatively demonstrate an invidious motive or purpose, *id.*— that is, that the legislature acted as it did, at least in part, "*because of* an anticipated * * * discriminatory effect" and not simply "'*in spite of*,' its adverse effects upon an identifiable group." *McCleskey*, 481 U.S. at 298, 107 S.Ct. at 1770 (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (emphasis in latter added). Only when it has been established that a discriminatory purpose was "a motivating factor" in the legislature's decision, is judicial deference no longer justified. *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

As background to a consideration of the validity of the Minnesota law which was

---

**1.** The fourteenth amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Our state constitution has no comparably worded provision. Minnesota Constitutional Study Commission, Final Report 15 (1973). However, Minn. Const. art. I, § 2 provides that "No member of this State shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Since the early part of this century we have treated this "as analogous to" the federal equal protection clause. D. McKnight, *Minnesota Rational Relation Test:*

*The Lochner Monster in the 10,000 Lakes,* 10 Wm. Mitchell L.Rev. 709, 723 (1984). With the exception of a few decisions of this court in the late 1970s and early 1980s, this court has treated the federal equal protection clause and our state equal protection clause as being equivalent. *Id.* More recently, we have "reiterated" that federal and state equal protection law are equivalent. *See, e.g., In re Estate of Turner*, 391 N.W.2d 767, 770 n. 2 (Minn.1986) ("We reiterate here that the rational basis standard used in Minnesota equal protection analysis is the same as the standard used in federal equal protection analysis.").

enacted in 1989, it should be noted that the Minnesota legislation was preceded by the federal Anti–Drug Abuse Act of 1986. That act amended 21 U.S.C. § 841(b)(1)(B) to equate 100 grams of cocaine powder and 1 gram of cocaine base or crack cocaine—the so-called "100 to 1 ratio"—for the purpose of determining punishment.[2] Under the federal act an offense involving mixtures weighing 5 grams or more containing cocaine base was subject to the same harsh punishment as an offense involving mixtures weighing 500 grams or more containing cocaine powder. *United States v. Levy*, 904 F.2d 1026, 1032 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). Our own Eighth Circuit, in rejecting a fifth amendment due process challenge to the act, pointed to the fact that Congress considered cocaine base or crack cocaine to be more dangerous than cocaine powder because of crack's potency, its more highly addictive nature, and its greater accessibility because of its.relatively low cost. *United States v. Buckner*, 894 F.2d 975, 978–79 (8th Cir.1990). I further note that the act has withstood claims that it violates fifth amendment equal protection. As stated in *United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C.Cir.1989):

A legislative body need not explicitly state its reasons for passing legislation so long as a court can devine some rational purpose. (citation omitted). Here, such purposes are readily apparent. Crack is far more addictive than cocaine.

It is far more accessible due to its relatively low cost. And it has experienced an explosion of popularity. (citation omitted). Any one of these factors would furnish a rational basis for the [100 to 1] distinction.

While considering ways of addressing the crisis created by crack cocaine, the 1989 Minnesota legislature heard testimony similar to that which in 1986 prompted Congress to adopt the "100 to 1 ratio." For example, the legislature was presented with evidence that crack cocaine and cocaine powder are not, as defendants contend and as the majority unjustifiably assumes, the same substance but different substances justifying dissimilar legislative treatment. The record demonstrates that although crack cocaine is derived from cocaine powder, the two substances have both a slightly different chemical composition[3] and a different pharmacological effect. The unique characteristics of crack cocaine were discussed not only in the legislative hearings but also in the affidavit of defendants' own expert in this litigation, M. Dawn Speier, Public Health Chemist for the City of Minneapolis. According to her, smoking crack cocaine "delivers a highly concentrated dose—at least 3 times that delivered by snorting an equivalent dose of cocaine powder—to the brain" and "abusers lose control faster with crack smoking than with snorting [powder]."[4] Similarly,

---

**2.** Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1002, 100 Stat. 3207–2 (Oct. 27, 1986).

**3.** Cocaine powder is an acid salt in which cocaine is joined with hydrochloride; the chemical formula is $C_{17} H_{21} NO_4$ .HCl. Crack cocaine is a bitter crystalline alkaloid (hence, the term cocaine base) made from cocaine hydrochloride, usually by adding ammonia or baking soda and heating the mixture to drive off the hydrochloride molecule by causing it to react with the ammonia or baking soda.

**4.** Compare with the testimony of Dr. Robert Byck, M.D., Professor of Psychiatry and Pharmacology, Yale University School of Medicine, before Congress in connection with the 1986 legislation:

[I]f you heat [cocaine base] to about the temperature of boiling water, it goes off into a vapor. [Then you can] inhale it into your lungs, and you can take a lot [in]. [By con-

trast, with cocaine, y]ou can pack your nose only so far * * * * As long as you keep breathing [the crack] vapor, you can get more dosage into yourself. That is the reason why crack * * * is so dangerous. There is an unlimited amount that can go in.

The speed of the material going to the brain is very rapid * * * * [Y]ou get an intense change in the mood of the individual, which initially is extremely pleasant, and someone wants to repeat it. But because it has gone in so fast, the level drops down quickly, and * * * somebody feels terrible * * * * So you take some more.

* * * [Y]ou realize that this is going to get you a bit edgy, so you take alcohol along with it. Multidrug abuse is very common * * * * Taking heroin * * * along with crack is fairly common.

So here we have a substance that is tailor-made to addict people. What do we graft

other experts have opined that "although it can take months or years for a nasal cocaine [powder] user to progress from recreational use, this can happen within days to weeks with crack." H.I. Spitz & J.S. Rosecan, *Cocaine Abuse: New Directions in Treatment and Research* 300–01 (1987). The combination of the low cost per unit of crack cocaine and the highly addictive nature of the substance has created an epidemic of crack trafficking and use, has fueled gang behavior, has destroyed individuals (including innocent babies, who, as a result of their mothers' addiction, are born addicted),[5] has destroyed families, and has ruined entire neighborhoods, prompting one of the authors of the 1989 legislation to conclude that crack cocaine is "by far the single most dangerous drug ever encountered."

This is not to say that today experts agree on the significance of the differences in the chemistry and effect of cocaine powder and crack,[6] or that there is unanimity on the significance of the differences in the marketing of cocaine powder and crack. But the legislature, like a jury, is generally free to determine what weight, if any, to give to the testimony of a particular expert. The legislature was persuaded by the evidence before it in 1989 that cocaine powder and crack cocaine require different legislative treatment either because they are different substances or because they are marketed differently, but the legislature was unwilling to use Congress' "100 to 1" ratio and instead equated possession of 10 grams or more of cocaine powder with possession of 3 grams or more of crack cocaine (a "10 to 3 ratio") in order to

deal evenhandedly with the typical street-level dealer of crack cocaine and the typical street-level dealer of cocaine powder. Rather obviously, the 1989 statute defining controlled substance crimes in the third degree was designed to discourage the sale of cocaine in either powder or crack form, for the legislature appears to have based the 10 to 3 ratio on evidence that a typical street-level cocaine dealer would possess, at the minimum and without regard to purity, 3 grams of crack or 10 grams of powder. The legislature also considered evidence regarding customary units of sale and the sale price of such a unit. On the one hand, the customary unit of sale of crack is a "rock" weighing .1 gram and selling on the street for $20 or $25. Thus, 3 grams of crack comprises approximately 30 distinct saleable units or "rocks" of crack having an aggregate street value of $600 to $750. On the other hand, although 10 grams of cocaine powder represents about 40 doses of cocaine powder, the customary unit of sale is the "8-ball," ⅛ ounce or about 3.5 grams, which sells for about $350. Ten grams of powder, then, comprise less than three saleable units of cocaine powder and have a street value of about $1,000. Accordingly, the weight ratio required in Minnesota to bring possession of powder or crack within the same degree crime is not the harsher (from the perspective of the crack possessor) federal ratio of 100 to 1 but is, rather, a ratio of 10 to 3. If, moreover, one looks to the realities of the street, the ratios shift dramatically: in terms of monetary value 10 grams of powder is worth about 1⅓ times that of 3 grams of crack, a ratio of 4 to 3; and in

onto it? We graft on, first of all, this gigantic import industry of many billions of dollars. Second, our own American marketing methods * * * * [W]hat we have here is the fast food solution. It is not that McDonald's hamburgers are necessarily better, * * * it is the fact that they are already prepared, they are ready to go, and they come in a little package. Here suddenly, we have cocaine available in a little package, in unit dosage, available at a price that kids can pay initially.
*See, e.g.,* "Crack" Cocaine: Hearing Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong., 2d Sess. 13 et seq. (1986). The

above testimony of Dr. Byck is quoted in *Buckner,* 894 F.2d at 979 n. 9.

5. *See,* in this regard, Sturner et al., *Cocaine Babies: The Scourge of the '90s,* 36 J. of For. Sciences 34 (1991).

6. *See, e.g.,* the summary of the testimony of Dorothy Hatsukami, a psychiatric researcher at the University of Minnesota, at the Minnesota Sentencing Guidelines Commission's recent hearings into the subject of the appropriate punishment for powder cocaine and crack cocaine offenses, in Minneapolis Star Tribune Metro Edition, Oct. 18, 1991, at 1B.

terms of saleable units, the possessor of 3 grams of crack holds about 30 saleable units to the three or less units of sale held by the possessor of 10 grams of cocaine powder, a ratio of 1 to 10 in favor of the crack holder. Finally, the majority assumes that the conversion ratio of pure cocaine powder to crack is 100%. It is not.[7] The witness who testified to a conversion rate of about 90% in the laboratory stated that because the purity of cocaine powder varied from month to month or even week to week and because crack houses operated rather less efficiently than laboratories, 10 grams of cocaine powder produced about 6 grams of crack. Thus, there is no basis upon which it can be said that 10 grams of cocaine powder is the equivalent of 10 grams of crack.

Moreover, even though cocaine is the "active ingredient" in both crack cocaine and cocaine powder, this court has previously acknowledged and approved a legislatively defined distinction based on the form in which a substance was marketed. *State ex rel. Flores .v. Tahash,* 272 Minn. 451, 454, 138 N.W.2d 626, 628 (1965) (legislative classification of codeine tablets as controlled substance upheld although a higher dosage of codeine per teaspoonful was available to the public in nonprescription cough syrup). Crack cocaine is used differently than is cocaine powder. According to the evidence before the legislature cocaine in the form of crack is a more highly addictive drug than cocaine in the form of powder. Crack cocaine is sold by the "rock," an easily transferable form with a unit price which makes it available to a larger group of consumers, including children. Equal quantities by weight of crack cocaine and cocaine powder have different monetary values. These differences in form and marketing raise social questions which, it seems to me, the legislature is entitled and competent to address by legislatively defined distinction.

The structure of the 1989 statute reveals a two-pronged attack designed to discourage drug dealing by simplifying prosecution of controlled substance crimes and setting stiffer penalties for violation. First, the legislature separated sale crimes from possession crimes, eliminating from possession crimes the element of intent to sell, an often difficult element of proof. Note, *Illegal Drugs, New Laws and Justice: An Examination of Five Recently Enacted Minnesota Statutes,* 16 Wm. Mitchell L.Rev. 499, 523–24 (1990). On the other prong the legislature created various degrees of controlled substance crimes and set different levels of punishment for each degree of controlled substance crime. There can be little doubt that the statute is aimed at drug dealers, for the level of frequency of unlawful sale and the amount of controlled substance sold or the amount possessed spelled out as constituting first, second, and third degree of controlled substance crime depict a kind of hierarchy of dealership: (1) the greater the sale, the more serious the crime and (2) typically, those who commit first degree crimes of possession are persons who might be called drug wholesalers; those who commit possession crimes in the second degree are large retailers; and those who commit third degree crimes of possession are street dealers—those who are users only and do not sell to others are quite unlikely to have in their possession such amounts of controlled substance.[8] I disagree with the majority's conclusion that by declining to make intent to sell an element of possession crimes the legislature has in effect created an impermissible presumption. The legislature, as it was free to do, simply eliminated the crime of possession with intent to sell while retaining the crime of

---

7. The majority's assumption reflects the trial court's incorrect finding that 9 grams of 90% pure cocaine powder converts to a little over 8 grams of crack. The only evidence before the trial court was that *10* grams of 90% pure cocaine powder could be converted to about 8 grams of crack. 10 grams $\times$ .90 purity = 9 grams $\times$ .90 conversion ratio = 8.1 grams.

8. In fact, there was evidence before the legislature that it was uncommon for a street dealer to carry 3 or more grams of crack on his or her person; that that quantity of crack was usually found in crack house raids.

unlawful possession of a controlled substance.[9]

Moreover, although the 1989 statute imposed more severe penalties than did its predecessor, the legislative history of the bill demonstrates a legislative intent *not* to punish the typical street-level dealer of crack more harshly than the typical street-level dealer of cocaine powder but, by pegging degrees of the crime of possession of a controlled substance and their respective penalties to the amounts of controlled substance typically possessed only by dealers of a particular level of dealership, to punish equally dealers of crack cocaine and dealers of cocaine powder. If one looks only at the evidence as to the amounts in terms of grams typically possessed by street-level dealers, the legislature was justified in assuming that it was accomplishing that purpose by classifying both unlawful possession of 10 grams of powder and unlawful possession of 3 grams of crack as third degree controlled substance crimes. If, however, one converts those quantities of cocaine powder and crack into typical units of sale (10 grams of powder represents less than three saleable units and 3 grams of crack represents 30 saleable units), the legislature treated possessors of crack more leniently.

Reasonable people can disagree about the wisdom of the legislature's classification scheme. But I disagree with the majority's conclusion that the classification scheme adopted by the legislature violates defendants' right to equal protection of the laws.

It is true that the trial court had before it evidence that of the 32 persons charged in Hennepin County from August 1, 1989 through August 1, 1990 with possession of 3 or more grams of crack, 31 were African–American. That same evidence also revealed that 16 of the 28 persons charged with possession of 10 or more grams of cocaine powder were African–Americans. Apart from the doubtful validity of any conclusion based on an informal review of a statistical population of 60 drawn from a single county,[10] such evidence may bear on the inquiry as to whether the legislature had a discriminatory purpose; but although "[d]isproportionate impact is not irrelevant, * * * it is not the sole touchstone of an invidious racial discrimination." *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563 (quoting *Washington,* 426 U.S. at 242, 96 S.Ct. at 2049).

*Here the record is barren of any evidence of discriminatory purpose by the legislature.* Indeed, if I were a member of the legislature who voted for the 1989 legislation I would be insulted by any attribution, however indirect, of discriminatory purpose because the record not only does not show the presence of discriminatory purpose, it tends to negate the presence of discriminatory purpose:

(a) Instead of adopting the harsher 100 to 1 gram weight ratio adopted by Congress in 1986, the legislature adopted a 10 to 3 gram weight ratio, hardly evidence of discriminatory purpose.

(b) Despite strong evidence of crack's greater danger to individuals and society, the legislature's aim apparently was not to punish street-level dealers of crack more harshly than street-level dealers of cocaine powder. Rather its apparent intent or purpose was to treat them equally, hardly evidence of discriminatory purpose.

---

9. The cases of both this court and the United States Supreme Court give the legislature wide latitude to determine the elements of a criminal offense and to exclude elements such as knowledge or specific intent. *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957); *State v. Kremer,* 262 Minn. 190, 191, 114 N.W.2d 88, 89 (1962). As one witness put it in support of removing the element of intent to sell, "[even] without the intent to sell, 3 grams of crack is an awful lot of havoc sitting there in someone's pocket under any circumstances and ought to be punished appropriately." Hearing

Before the Criminal Justice Div. of the Minn. House Judiciary Comm., 76th Minn.Leg., Feb. 24, 1989 (statement of Jim Kamin, Assistant Hennepin County Attorney).

10. In *McCleskey,* 481 U.S. at 286–87, 313, 107 S.Ct. at 1763, 1778, the validity of two sophisticated statistical studies that examined more than 2,000 cases was assumed, but the statistics were held insufficient to support an inference of discriminatory intent or unconstitutional discrimination.

(c) The full record discloses that the statutes dealing with controlled substance crimes were only one element of a multifaceted approach to the drug problem. Simultaneously, the legislature also considered bills to provide additional funds for drug education and prevention and bills directed to development of quality drug abuse treatment for low income and minority people.[11]

(d) The statutes dealing with controlled substance crimes were but one part of a large package of significant crime control legislation enacted in 1989. *See* Wolf, 1989 Crime Legislation, in Minn.C.L.E. 24th Annual Criminal Justice Institute (1989). Not only is the record devoid of evidence to support the contention that the legislature acted with discriminatory intent or purpose, it seems to me that it affirmatively shows that the legislature acted *without* discriminatory intent or purpose.

The record similarly fails to support defendants' contention that police and prosecutors have applied the law in a discriminatory manner. As firmly-rooted judicial precedent mandates, a defendant seeking the dismissal of charges on this basis must prove that others similarly situated have not been prosecuted and that he or she has been singled out for prosecution on the basis of an impermissible consideration such as race. *See, e.g., State v. Russell*, 343 N.W.2d 36, 37 (Minn.1984) (relying on *Arlington Heights*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, and *Washington*, 426 U.S. 229, 96 S.Ct. 2040). In *Russell*, we upheld the burglary conviction of a black man caught in a so-called "sting" operation despite the fact that 48 black persons and only one white person were prosecuted in the sting. We concluded that the defendant had not met his burden of proving discriminatory enforcement.

> [I]t appears that the police were conducting a neutral undercover operation in predominantly black neighborhoods that were plagued by a high residential burglary rate and that their sole purpose was to identify and prosecute as many of the offenders as possible. The fact that most of the offenders in predominantly black neighborhoods were black does not establish purposeful discrimination any more than the fact that most of the offenders were white would establish purposeful discrimination in an undercover operation in a predominately white neighborhood having a similar high residential burglary rate.

*Id.* at 38.

I have no reason to doubt the assertion that, based upon the 60 persons charged in Hennepin County with violations of section 152.023 during the one-year period ending August 1, 1990, more African–Americans than white persons were prosecuted for possession of 3 grams or more of crack cocaine and 10 grams or more of cocaine powder. However, defendants have failed to establish either that those other defendants were selected for prosecution on the basis of their race or that they themselves have been selected for prosecution on the basis of race. Indeed, it appears that is not the case. According to the Minnesota Office of Drug Policy:

> The great bulk of the 1989 Minneapolis arrests of minorities came from crack house raids during which many people were often arrested simply for being in the house in close proximity to crack and drug paraphernalia. The reason for the huge number of entries is that neighbors clamor for them. Neighbors see the symptoms of drug dealing: increased traffic, frequent but short visits by a steady parade of people unrelated to the resident, occasional glimpses of rolls of cash and weapons, etc. They become fearful for themselves and their children, so they call the police.

Minnesota Drug Strategy 1991, Report to the 1991 Minnesota Legislature at 11 (Office of Drug Policy, Jan. 1, 1991). That police response to neighborhood concerns about drug trafficking results in the arrest and ultimate prosecution of a greater number of African–American persons than white persons for the offense in question

---

11. Hearings on S.F. 3–H.F.59, Before the Subcomm. on Criminal Justice, 76th Minn.Leg., Mar. 3, 1989 (statements of Rep. Kelly); Before the Criminal Justice Div. of the Minn. House Judiciary Comm., 76th Minn.Leg., Mar. 10, 1989 (statements of Sen. Luther).

and other drug-related offenses does not, in my opinion, demonstrate discriminatory enforcement any more than if it were demonstrated that a far greater percentage of white persons than African–Americans were arrested and prosecuted for embezzlement or some other crime.

Despite the utter absence of any evidence that the legislature acted with discriminatory intent or purpose or that law enforcement officers engaged in discriminatory enforcement, the majority, applying what it calls "the rational basis test as articulated under Minnesota law," has declared Minn.Stat. § 152.023, subd. 2(1) (1989) violative of article I, section 2, the equal protection clause of the Minnesota Constitution. Of course, this court may, and when the scope of a provision in the Minnesota Constitution differs from that of its federal counterpart frequently does, construe the Minnesota Constitution to afford greater individual rights than are afforded by the United States Constitution. *E.g., State v. Hershberger,* 462 N.W.2d 393 (Minn.1990). But this court has consistently ruled that the rational basis standard used in Minnesota equal protection analysis is the same as the standard used in federal equal protection analysis. *E.g., AFSCME Councils 6, 14, 65 and 96 v. Sundquist,* 338 N.W.2d 560, 569 n. 11 (Minn.1983); *State v. Forge,* 262 N.W.2d 341, 347 n. 23 (Minn.1977). The argument that Minnesota applies a rational basis test that differs from the federal standard has been put to this court before and emphatically rejected, most recently in *In Re Estate of Turner,* 391 N.W.2d 767, 770 n. 2 (Minn.1986) (Wahl, J., concurring specially).

What the majority has actually done here is to engage in substantive review—the kind of review epitomized by *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)—"criticized from its inception and * * * generally unmourned since its demise in the middle 1930s."[12] One commentator, a prominent advocate of state constitutional theory, has defined

substantive review as "judicial appraisal of the substance of laws directly under [the equal protection clause] * * * unaided by substantive values attributed to other provisions of the Constitution."[13]

In short, substantive review replaces an appropriate standard of review, not with a stricter standard, but with no standard at all. That the majority has substituted its political judgment for that of the legislature is, perhaps, best illustrated by its cavalier dismissal of the testimony which the legislature heard. One cannot, it seems to me, characterize as "anecdotal," thus connoting the recounting of an isolated, atypical incident, the testimony of a lawyer of the Office of the Hennepin County Attorney who handled about 700 narcotics cases in the four years immediately preceding his testimony or the testimony of a sergeant of the Narcotics Division of the Minneapolis Police Department. Their testimony, although not of scientific precision, was certainly "empirical," i.e., "derived from or guided by experience," The American College Dictionary, Random House (1964), and the legislature was clearly entitled to credit that testimony. The majority's denigration of the testimony differs little in my opinion from a reviewing court's setting aside a jury's determination of credibility.

In conclusion, the power to define what act constitutes a crime and to fix the punishment for that crime rests with the legislature. This court has neither the obligation nor the right to interfere with legislation dealing with the control of crime without a very good reason. Absent some evidence of discriminatory intent or purpose, the fact that more black persons than white persons violate Minn.Stat. § 152.023, subd. 2(1) (1989) is not a basis for declaring the statute unconstitutional although it may well be indicative of deep-seated societal failings. Social problems, however, are seldom susceptible of facile definition or scientific proof or easy resolution. In my view, the cumulative evidence the legislature considered and the thoughtful re-

12. D. McKnight, *Minnesota Rational Relation Test: The Lochner Monster in the 10,000 Lakes,* 10 Wm. Mitchell L.Rev. 709, 733 (1984).

13. Linde, *Due Process of Lawmaking,* 55 Neb. L.Rev. 197, 199 (1976).

marks of the bill's authors and of other legislators exhibit only a commendable, concerted, and reasoned good faith effort to address a serious social problem.[14]

Because I believe that Minn.Stat. § 152.-023, subd. 2(1) (1989) meets the equal protection requirements of both the United States Constitution and the Minnesota Constitution, I would answer the certified question "no" and reverse the trial court.

---

**14.** Ironically, the effect of this court's decision may be that street-level crack dealers in Minnesota will find themselves once again being prosecuted in federal court under the "100 to 1" federal statute. It appears that before 1989 the federal prosecutor in Minnesota handled a large number of these cases because the Minnesota law was so lenient when compared with the federal law. *St. Paul Pioneer Press Metro Edition,* Sept. 3, 1991, at 1C. With this court's striking the 1989 legislation, which is still more lenient than the federal statute, the federal prosecutor conceivably may once again decide to prosecute street-level crack dealers in Minnesota. Indeed, there is no double jeopardy bar to federal prosecution of these defendants. *Heath v. Alabama,* 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977); *State v. Aune,* 363 N.W.2d 741 (Minn.1985).